[Civ. No. 36330. Second Dist., Div. Five. May 27, 1971.]

VIRA DEE MAE CARMICHAEL et al., Plaintiffs and Appellants, v. JAMES REITZ et al., Defendants and Respondents.

964

**COUNSEL**

Harney, Ford & Schlottman and David M. Harney for Plaintiffs and Appellants.

Bonne, Jones & Bridges, H. Gilbert Jones, McCutchen, Black, Verleger & Shea, Dryden, Harrington & Swartz and Winchester Cooley III for Defendants and Respondents.

## Opinion

**AISO, J.**—Plaintiff Vira Dee Mae Carmichael and her husband Richard Carmichael[1] brought this action for damages against defendants James Reitz, M.D., J. G. Dahlquist, M.D., the Harriman-Jones Medical Clinic, and G. D. Searle & Company, a corporation (hereinafter "Searle"), for pulmonary embolisms[2] and thrombophlebitis[3] allegedly caused by Dr. Reitz's having prescribed the drug Enovid, manufactured and marketed by Searle, in treating plaintiff for endometriosis.[4]

A motion for nonsuit made by defendants Dr. Reitz, Dr. Dahlquist, and the Harriman-Jones Medical Clinic upon plaintiff resting her case in chief was granted and a judgment of nonsuit entered. Plaintiff appeals from this judgment only insofar as it concerns defendant Dr. Reitz.

The trial was completed as to Searle and the jury returned a verdict in its favor. Plaintiff also appeals from the judgment entered on the verdict.

Since the issues raised by the respective appeals are disparate except as the negligence, if any, on the part of Dr. Reitz might bear upon the issue of proximate causation in the case against Searle,[5] and since the evidence to be considered on the disparate issues is not the same, we treat the two appeals separately.

### Appeal Against Dr. Reitz

Plaintiff, in this phase of her appeal, contends that the trial court prejudicially erred: (1) in granting the nonsuit since she had made out a prima facie case sufficient to go to the jury on the theories of (a) negligence, (b) failure to obtain an "informed consent," (c) res ipsa loquitur, and (d) strict liability; and (2) in ruling a certain question propounded by plaintiff's counsel to Dr. Reitz as argumentative.

---

[1]Since any recovery of coplaintiff husband is predicated upon plaintiff wife establishing a basis for recovery, we shall refer to the plaintiff in the singular for the sake of simplicity.

[2]All definitions of medical terms are taken from Dorland's Medical Dictionary (23d ed. 1961) unless otherwise indicated. Embolism: "The sudden blocking of an artery or vein by a clot or obstruction which has been brought to its place by the blood current."

[3]Thrombophlebitis: "A condition in which inflammation of the vein wall has preceded the formation of the thrombus." Thrombus: "A plug or clot in a blood vessel or in one of the cavities of the heart, formed by coagulation of the blood, and remaining at the point of its formation."

[4]Endometriosis: "A condition in which tissue more or less perfectly resembling the uterine mucous membrane occurs aberrantly in various locations in the pelvic cavity."

[5]See *Magee* v. *Wyeth Laboratories, Inc.* (1963) 214 Cal.App.2d 340, 351 [29 Cal. Rptr. 322].

We fail to find merit in any of these contentions for the reasons we set forth below and therefore conclude that the judgment of nonsuit in favor of Dr. Reitz should be affirmed.

I.

Before reaching the substantive aspects of the nonsuit, we ascertain *in limine* just what theories of recovery and what evidence are properly before us in this review of the nonsuit, because plaintiff's brief manifests confusion in this respect.

In determining whether the evidence was sufficient to permit plaintiff to go to the jury only the evidence which was before the court at the time when the nonsuit was granted may be considered. (Cf. *Ely* v. *Beal* (1950) 100 Cal.App.2d 743, 745 [224 P.2d 479]; *People* v. *Superior Court* (1970) 3 Cal.App.3d 476, 482, fn. 3 [83 Cal.Rptr. 771]; *Thompson* v. *Superior Court* (1968) 262 Cal.App.2d 98, 103 [68 Cal.Rptr. 530].) It would be patently unfair to opposing counsel and to the trial judge for a plaintiff to permit the granting of nonsuit in the trial court and then claim error on appeal on the basis that in hindsight the evidence introduced after the grant of nonsuit supplied gaps in plaintiff's case. Unlike the situation in *Perry* v. *First Corporation* (1959) 167 Cal.App.2d 359, 368 [334 P.2d 299], plaintiff's experienced trial counsel rested his case in chief without making it subject to reopening on the issue of liability against Dr. Reitz. He likewise did not move for a new trial against Dr. Reitz; plaintiff's motion for new trial was directed against Searle only.

It is also noted Dr. Reitz was temporarily excused, after plaintiff's examination of him under Evidence Code section 776, upon the understanding that Searle would be given the opportunity to cross-examine him at a later date when he could again be in court. The trial judge did not rule immediately on the motion for nonsuit, indicating that he would prefer to first hear the balance of Dr. Reitz's testimony. But then in the course of Searle's cross-examination of Dr. Reitz, the trial judge granted the motion for nonsuit. No objection was made by plaintiff's counsel as to the point in time at which the trial judge ruled on the motion, nor did he request the judge to further defer his ruling.

Under the foregoing circumstances, any reference plaintiff makes to the testimony of Dr. Boyle or of any other physicians (including Dr. Reitz) who testified after the nonsuit was granted must be disregarded in determining whether the grant of nonsuit was proper.

██ Similarly our reading of the record[6] leads us to conclude that in fairness to the trial judge and counsel for Dr. Reitz, plaintiff's counsel abandoned all theories of recovery except that of "strict liability" in submitting the issue of nonsuit to the trial judge for ruling.

The issue of "informed consent" is raised in the pleadings only as it is interwoven into the count pleading negligence. In his redirect examination of plaintiff, her counsel propounded to her two questions which sought to inquire whether she would have consented to take Enovid had she been told of the "so-called side effects and adverse reactions due to Enovid" which had been read into the record up to that time.[7] Objection was sustained to the first question and motion to strike the answer given before objection could be registered was granted; objection was sustained as to the second. Plaintiff's counsel did not inform either the court or opposing counsel at this time that there was an "informed consent" issue and that the questions might be relevant to this issue. We find no substantial evidence to

[6]The pertinent portions of the reporter's transcript are too long to set forth in *haec verba*, but reference is made to pages 858-863, 866-868, 872-875, 909-913, 919-921, 923, 926. The acknowledgment by plaintiff's counsel on page 921 that there was no evidence that Exhibit "A" (referred to on p. 911) was received by Dr. Reitz cannot be characterized as inadvertent. The only portion of the testimony of witness Bartlett, medical service representative or salesman of defendant Searle in 1964 for the area, which relates to whether Dr. Reitz received Exhibit "A," is as follows: "Q. Did you ever call on Dr. Reitz, sir? A. No, sir. Q. Did you ever call on Dr. Dahlquist? A. No, sir. Q. Did you ever call on the Harriman Jones Clinic? A. No, sir, I didn't. Q. Have you ever called upon any doctor who has ever had any connection with Mrs. Carmichael insofar as you are aware? A. Not to the best of my knowledge. . . . Q. All right. Now, concerning Exhibit A, did every physician in the United States of America get this thing before May of 1964? A. I couldn't answer that, sir. Q. How was it distributed and to whom was it distributed? A. Well, I can speak for myself. I gave it out myself and I know that we have quite a mailing from Chicago. I cannot speak about what happened in Chicago and what every physician in the United States received, sir. Q. Were they selected on any basis of which you are aware; that is, every tenth physician or every forty-ninth physician or every physician? A. I would have no knowledge of that, sir. Q. You have no understanding at all of how those things were distributed? A. No, sir. You would have to ask that question of someone in Chicago."

[7]"BY MR. HARNEY: Do you recall the reading in the trial of a list of so-called side effects and adverse reactions due to Enovid? A. Yes, sir. Q. If anybody had ever told you about these problems, would you ever have agreed to take Enovid? A. No, sir.
"MR. JONES: Objected to on the grounds of being argumentative.
"THE COURT: Sustained.
"MR. JONES: May the answer be stricken?
"THE COURT: Yes, it is stricken.
"Q. BY MR. HARNEY: If the information that was read here in court had been told you by anybody, would you ever have consented or agreed to take the Enovid?
"MR. JONES: Just a moment. I will object to the question on the ground it is improper redirect examination and not raised in any way.
"THE COURT: Sustained.
"MR. HARNEY: That is all I have then."

support the contention that had Dr. Reitz more fully explained the then prevailing medical status of Enovid as a prescription for the treatment of endometriosis plaintiff would not have taken it. Again, at the time of submitting the motion for nonsuit no mention was made of the "informed consent" issue as still pending.

■ It is the general rule that where issues of fact or mixed questions of law and fact are involved, one cannot change his theory of recovery on appeal. (*Estate of Westerman* (1968) 68 Cal.2d 267, 279 [66 Cal.Rptr. 29, 437 P.2d 517]; *Barrera* v. *De La Torre* (1957) 48 Cal.2d 166, 172 [308 P.2d 724]; see *Panopulos* v. *Maderis* (1956) 47 Cal.2d 337, 340-341 [303 P.2d 738].) ■ As corollaries or ramifications of this rule, it has been held that: stipulations as to legal issues or facts entered into in the trial court must be adhered to upon appeal (*Vitale* v. *City of Los Angeles* (1936) 13 Cal.App.2d 704, 706 [57 P.2d 993]); counsel may not abandon a theory of recovery during the trial and then seek to revive it on appeal (*Goodwin* v. *Wolpe* (1966) 240 Cal.App.2d 874, 877, 878-879 [50 Cal.Rptr. 55]); if counsel concedes that his cause of action sounds in negligence and not on contract, it will be treated as a negligence action on appeal (*Griffin* v. *County of Colusa* (1941) 44 Cal.App.2d 915, 918 [113 P.2d 270]); if, in course of argument on whether a nonsuit should be granted, counsel indicates that there is no necessity of the court considering a given issue, he cannot urge the failure of the trial court to consider the issue as error on appeal (*Drdlik* v. *Ulrich* (1962) 203 Cal.App.2d 360, 367 [21 Cal.Rptr. 642]); and one cannot raise on appeal material issues which he abandons at the trial level as a matter of strategy and purely for his own advantage (*De Angeles* v. *Roos Bros., Inc.* (1966) 244 Cal.App.2d 434, 442-443 [52 Cal.Rptr. 783]). ■ Application of the teachings of these cases to the pleadings and the record specified in footnote 6, *supra,* precludes plaintiff from urging here any theory of recovery other than the one based upon strict products liability, predicated upon the premise that the doctor was a retailer of the drug Enovid. We shall, nevertheless, in fairness to plaintiff point out that there was insufficient evidence on the merits to go to the jury on the theory of negligence.

## II.

With the foregoing limitations and criteria in determining the propriety of the nonsuit in mind,[8] we now set forth the facts and evidence relevant to the nonsuit issue.

---

[8]"A nonsuit in a jury case . . . may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in

Plaintiff first sought the professional services of Dr. Reitz, a specialist in obstetrics and gynecology, on July 10, 1963. She complained that she was experiencing pain in conjugal sexual intercourse, that she had a "dropped uterus," and that she had been married for a period of two and one-half years without becoming pregnant. She also informed Dr. Reitz that she was having "a great deal of pain with her menstrual periods" and "had been passing formed blood clots" during those periods. She also mentioned that she had noted personality changes in herself with her menstrual periods—"depression coming on with the menstrual period, and a feeling of excitement prior to this stimulation."

In the course of taking plaintiff's past history, Dr. Reitz asked her whether she was allergic to or whether she had had any bad reactions to any medication or drugs. Plaintiff replied, "No." Dr. Reitz inquired, "What diseases have you had in the past?" Plaintiff replied that she had had diphtheria, and that she had also undergone a tonsillectomy and an adenoidectomy. She indicated that she had no family history relative to tuberculosis, cancer, or diabetes.

During this visit, Dr. Reitz conducted a physical examination which, in addition to the pelvic area, encompassed the chest, head, neck, abdomen, rectum, and extremities. Percussion and auscultation of the chest indicated no abnormality and no chest problems as of that time. An X-ray of the chest was also taken; it proved negative for abnormalities. During this physical examination, the doctor noted two unusual things: "One was the rate and intensity with which the deep tendon reflexes appear; and the other . . . that when stretching the hands there was a small tremor present in the fingertips." These factors combined with a slightly larger than normal thyroid suggested possible hyperthyroidism. There were no varicosities (varicose veins) and arterial circulation was good. Blood pressure was normal. There was no indication of thrombophletbitis. A "Pap"[9] smear for cancer was taken. The test of the smear proved negative, but it revealed that plaintiff's estrogen[10] function was "marked." However, this did not necessarily mean that her "ovaries were putting out more than normal." "Well, in the context of the 'Pap' smear it means either that the woman is producing

their favor. [Citations.]" (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84].)

[9]A colloquialism for Dr. George Papanicolaou. "Papanicolaou's stain: A method of staining smears of various body secretions, from the respiratory, digestive or genitourinary tract, for the examination of exfoliated cells, to detect the presence of a malignant process."

[10]"Estrogen: A generic term for estrus-producing compounds." "Estrus: 2. The cycle of changes in the genital tract which are produced as a result of ovarian hormonal activity."

amounts which are compatible with the reproductive phase of life which would be marked or moderate, which would occur shortly after menopause; slight, which would occur later after menopause in the absence of drugs and which would occur late in life or very early in life." A urinalysis showed normal, as did a blood count. No bleeding or clotting time studies were made. No chemical or laboratory analysis was made on the menstrual clot material. He did not take a biopsy.

Dr. Reitz diagnosed a minimal case of endometriosis. He recommended that plaintiff attempt to become pregnant and prescribed Cyclex, a combination diuretic and tranquilizer, for the abdominal bloating and personality changes (premenstrual tension) of which plaintiff complained. He advised her to return in a year. On July 19, 1963, Dr. Reitz spoke to plaintiff on the telephone and advised her of the results of the laboratory tests enumerated above.

Plaintiff returned to Dr. Reitz's office on May 12, 1964. The doctor noted on this occasion that there had been no progression in her symptoms; in fact, they were slightly more favorable despite her having been unable to become pregnant since her July 10, 1963, visit. Plaintiff stated that she was desirous of becoming pregnant. She also said that she had experienced some nausea and loss of appetite during the several months preceding this second visit, but that her overall problems in 1964 were less than in July 1963. She informed the doctor that she had been suffering from "flu" for a few weeks prior to her visit.

On this May 12, 1964, occasion plaintiff was not given a complete physical examination. Dr. Reitz examined her chest by percussion and ausculation; the indications were that it was then clear. No X-ray was taken as less than a year had elapsed since his taking of the X-ray in July 1963. Plaintiff stated that she was being seen elsewhere for her chest problem. Dr. Reitz relied upon the physician treating her for her "flu" to take X-rays if that doctor should feel it necessary. He also believed that X-rays had been taken in that other doctor's office. Plaintiff did not complain of any present chest pain on this second examination. On the basis of the July 10, 1963, chest X-ray and his current physical examination of the chest area, Dr. Reitz at that time ruled out any pulmonary embolisms up to that time. Consequently, he did not inquire further about any chest pains.

He then believed that plaintiff's endometriosis had progressed from "minimal" to "moderate" even though the amount of pain plaintiff experienced had decreased slightly. An X-ray of plaintiff's uterus and fallopian tubes was taken on May 12, 1964, as part of a hysterosalpingographic examina-

tion,[11] which confirmed the diagnosis.[12] A "Pap" test was repeated to determine if there were any tumors or any similar problem in the pelvic area. The doctor examined for mastitis of the breast for any possible indication of tumors. He supplemented his previous medical history[13] of the plaintiff by asking her if she had had any liver disease or genital cancer. He also either looked for or inquired about diabetes, phlebitis,[14] and pulmonary embolisms.

Dr. Reitz decided to prescribe Enovid,[15] which he considered the drug of choice, for plaintiff's problems since pregnancy, which he considered to be the optimal treatment, had not been achieved. He did not feel that surgery was called for at the time in view of the seriousness of surgical procedure. He examined plaintiff for pregnancy because Enovid taken during pregnancy can cause masculinization of a female infant. He prescribed the pill for the purposes of: treating the endometriosis (including premenstrual tension syndrome); treating the heavy ("characterized by the passage of clotted blood") and painful menstrual flow (dysmenorrhea); and assisting in achieving pregnancy.

Dr. Reitz testified that he advised plaintiff of the risks and hazards of breakthrough bleeding, nausea, and vomiting in taking Enovid, and instructed her that if she had problems with the medicine to contact him. Plaintiff testified that Dr. Reitz discussed endometriosis with her; that it caused blood cysts; that he informed her that in some instances Enovid

[11]Hysterosalpingography: "Roentgen-ray study of the uterus and oviducts (fallopian tubes) after the injection of opaque material."

[12]In an X-ray consultation report, dated May 14, 1964, Tom A. Kendig, M.D., radiologist, stated in part: "The uterine cavity showed moderate irregularity in outline thought to be the result of endometrial hyperplasia. There is one rather well defined sessile protrusion towards the internal os on the anterior aspect, thought to represent particularly prominent localized area of hyperplasia. The uterus is rather markedly retroflexed and moderately retroverted. There is stenosis of the internal os of moderate degree."

[13]We think this is a proper interpretation of the evidence. When this line of questions was being asked, Mr. Jones [Dr. Reitz's attorney] stated, "I assume all these questions have to do with 1969 because they are in the present tense." Mr. Harney replied, "Well, I was talking about what he was finding out back in '64."

[14]Phlebitis: "Inflammation of a vein. The condition is marked by infiltration of the coats of the vein and the formation of a thrombus of coagulated blood."

[15]Dr. Reitz testified that Enovid is "a combination of two agents; one is progesterone and one is estrogen." Dorland's definition of progesterone is: "The hormone produced by the corpora lutea whose function it is to prepare the uterus for the reception and development of the fertilized ovum by a glandular proliferation of the endometrium." Corpus luteum: "[A] yellow mass in the ovary formed by a graafian follicle which has matured and discharged its ovum; if the ovum has been impregnated, the corpus luteum grows and persists for several months; if impregnation has not taken place, the corpus lutem degenerates and shrinks."

might be helpful in treating endometriosis and that a purpose for prescribing Enovid was to treat the endometriosis.

Prior to his prescribing Enovid for plaintiff, Dr. Reitz knew of a statistical relationship between thromboembolic episodes and Enovid, but he did not believe that there was a causal relationship between the two. The Physicians' Desk Reference for 1964 (copyrighted in 1963), which he used, indicated that no contraindications were known. Plaintiff also called the attention of the doctor, during his Evidence Code section 776 examination, to certain product literature concerning Enovid, issued by Searle on March 5, 1964 (defendant's Exhibit "A"), which stated under contraindications: "Previous Thrombophlebitis or Pulmonary Embolism. Enovid-E is contraindicated in these patients unless the reason for its use in the judgment of the physician is overwhelming." Dr. Reitz was unable to recall whether he had seen this literature. As noted earlier in this opinion, there is no evidence that Dr. Reitz ever received it, which state of the evidence was acknowledged by plaintiff's counsel at the time of nonsuit. Dr. Reitz admitted there was no overwhelming need for prescribing Enovid to plaintiff. He was permitted to testify that in his opinion, at the time he prescribed Enovid in 1964, pulmonary embolism was not recognized to be an adverse reaction of Enovid in the medical community. And as earlier alluded to, he also testified that he had read and considered articles and books relating to Enovid other than the Physicians' Desk Reference for 1964, and that he considered these, as well as others mentioned by plaintiff's counsel, in arriving at his decision to prescribe Enovid.

The prescription was filled at a pharmacy on May 14, 1964. The directions on the label were: "One tablet daily for 14 days then one tablet 2 times a day." Plaintiff waited until May 25, 1964, before she started taking the pills as she had had "a rather bad time" with her menstrual period and she wanted to wait until it was over. Plaintiff, who did not normally eat breakfast, took her first pill on Monday morning, May 25, 1964, and within one hour became extremely nauseous. She "took it for one or two days" and then called Dr. Reitz, who advised her to continue taking the medication "if at all possible." By Friday, June 5, 1964, she was spitting up blood and experiencing chest pains and shortness of breath. Her pain had alleviated the following morning, but it grew more intense as the day wore on. On Sunday morning, she called the Harriman-Jones Clinic and was told to come in at 2 p.m. that afternoon. She did so and was seen by Dr. Horvitch, at which time an X-ray of the chest was taken and reported as being negative. Dr. Horvitch diagnosed plaintiff's complaints as being caused by bronchopneumonia and prescribed an antibiotic, Tetracycline.

Plaintiff was examined by Dr. Reitz on Monday, June 8, 1964, and was

instructed to continue with the antibiotic as prescribed by Dr. Horvitch. Her pain continued to get worse, so she went to the clinic on Tuesday as soon as it opened. Dr. Reitz examined her again and then turned her over to Dr. Joseph G. Dahlquist (originally a codefendant, a partner of Dr. Reitz in the Harriman-Jones Medical Clinic, and a specialist in internal medicine) for further treatment. Dr. Dahlquist had plaintiff immediately hospitalized in the Long Beach Community Hospital. He took a detailed history from plaintiff at the time of her admission to the hospital on June 9, 1964. His diagnosis, as of this date, was pneumonia with possible pulmonary embolism originating from a pelvic thrombophlebitis.

On June 10, 1964, Dr. Dahlquist inquired into plaintiff's chemical exposure and learned that she had taken Enovid as prescribed by Dr. Reitz.[16] He then made a notation of the "possibility of Enovid-induced embolism." Due to Dr. Dahlquist's absence from the city for the next four days, plaintiff was cared for during Dr. Dahlquist's absence by Dr. Martin, Dr. Dahlquist's associate and also a board-certified internal medicine specialist. Dr. Martin recorded on Thursday, June 11, 1964, that he had no doubt but that plaintiff had suffered a pulmonary embolism. Dr. Martin contacted Dr. Dahlquist by telephone just as soon as the latter returned from Idaho Falls (where he left his family) around 4 p.m. on Sunday, June 14, 1964, and informed Dr. Dahlquist that a venogram[17] disclosed large clots in the inferior vena cava,[18] and that "they" felt that immediate surgery to tie off the inferior vena cava should be performed to prevent further possibly massive and fatal pulmonary embolism. Following consent to the operation, a plication[19] of the inferior vena cava was performed that day by Dr. Gaspar, a surgeon, who was "already scrubbing" when Dr. Dahlquist returned.

A D & T (diagnostic and therapeutic) conference was held at the Harriman-Jones Clinic following the operation. Prior to the conference, a more detailed history of the plaintiff was obtained. What plaintiff had characterized as "flu" consisted of "generalized chest pain and symptoms of coryza" (common cold). There were also revealed episodes in 1961 and 1963 wherein plaintiff had experienced a sudden onset of pain in the right chest with low-grade fever, along with coughing of blood in 1963.

---

[16] Use of Enovid as medication at the instance of Dr. Reitz automatically terminated with plaintiff's admission to the hospital.

[17] Venogram: "1. A roentgen ray photograph of the veins."

[18] Vena cava inferior: "[T]he venous trunk for the lower extremities and for the pelvic and abdominal viscera. It begins at the level of the fifth lumbar vertebra by union of the common iliac veins and passes upward on the right of the aorta and empties into the right atrium of the heart."

[19] Plication: Dr. Dahlquist explained it as a "suturing off instead of tying the vessel off completely. . . . It leaves a sieve-like quality."

Dr. Dahlquist testified that these symptoms were consistent with thromboembolism; that low-grade fever would generally cause a doctor to suspect thromboembolism.

In his report to the Food and Drug Administration, dated August 26, 1964, Dr. Reitz concluded that plaintiff had possibly suffered minor thrombophlebitic or embolic disorders in December 1961 and January 1963. They, however, had been diagnosed by the treating doctors as "flu."

■ For the purposes of nonsuit, the testimony of Dr. Arthur Samuels, M.D., a specialist in hematology,[20] that Enovid rather than endometriosis caused plaintiff's pulmonary embolism in 1964 is sufficient on the element of causation. His conclusions were based upon a series of clinical studies or experiments he conducted on plaintiff from July 18 to August 11, 1967, which included the ingestion of Enovid with a drastic reaction requiring a complete ligation[21] of plaintiff's inferior vena cava on August 20, 1967.

It was stipulated that Dr. Samuels rendered no opinion on whether "Dr. Reitz in this case conformed to applicable standards of practice in this community under the circumstances."

· The testimony of Laurence Pilgeram, Ph.D., as to his studies concerning Enovid was offered only as against defendant Searle.

Other facts or evidence may be referred to where pertinent to the discussion in the interests of keeping the opinion as short as possible. Its considerable length, however, cannot be avoided without sacrificing adequacy of treatment of the issues raised.

### III.

■ There was insufficient evidence to go to the jury on the theory of negligence; consequently the nonsuit is immune from attack on this ground.

■ "The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 86 [147 P.2d 604]; see Comment, 14 Stan.L.Rev. 884, 891-

---

[20]Hematology: "That branch of biology which treats of the morphology of the blood and blood-forming tissues."

[21]Ligation: "The application of a ligature." Ligature: "1. A thread or wire for tying a vessel or strangulating a part."

892.)" (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480].) "The 'law has never held a physician or surgeon liable for every untoward result which may occur in medical practice.' . . . No different or 'higher degree of responsibility' is imposed 'in making a diagnosis than in prescribing treatment.' . . . ▇ A doctor's failure to possess or exercise the requisite learning or skill 'in a particular case is generally a question for experts and can be established only by their testimony' . . . , which 'expert evidence is conclusive' where it appears that the 'matter in issue is one within the knowledge of experts only and is not within the common knowledge of laymen.' . . ." (*Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 473 [234 P.2d 34]; see also: *Stephenson* v. *Kaiser Foundation Hospitals* (1962) 203 Cal.App.2d 631, 635-636 [21 Cal.Rptr. 646]; *Sanchez* v. *Rodriguez* (1964) 226 Cal.App.2d 439, 449 [38 Cal.Rptr. 110].) ▇ A medical specialist must possess and use the learning, care and skill normally possessed and exercised by practitioners of that specialty under the same or similar circumstances. (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].)

▇ To establish liability for malpractice, it was incumbent upon plaintiff to prove that Dr. Reitz was negligent. This issue breaks itself down into the following subsidiary questions: Was he negligent in his history taking? Should he have contacted plaintiff's physician who was treating her for "flu" in May 1964? Should he have taken another X-ray, a biopsy, and a blood specimen for blood coagulation tests? Was he negligent in failing to diagnose the possible pulmonary embolisms of 1961 and 1963? Was his overall diagnosis and prescription of Enovid for the purposes intended negligent? These are matters not within the realm of common knowledge. Without expert testimony, we cannot determine whether any or all of these matters failed to measure up to the criteria to determine medical malpractice, which we have reviewed above. Yet, we fail to find anything in the testimonies of Doctors Reitz, Dahlquist, Samuels or Wilson, who testified prior to the nonsuit, that Dr. Reitz's acts or omissions failed to measure up to the learning, care, and skill normally possessed and exercised by gynecologists under the same or similar circumstances. This is not a case where jurors could rest their finding on common knowledge so as to justify a res ipsa loquitur instruction premised thereon. (See *Bardessono* v. *Michels* (1970) *supra*, 3 Cal.3d 780, 790.)

▇ Citing this court's opinion in *Berkey* v. *Anderson* (1969) 1 Cal. App.3d 790 [82 Cal.Rptr. 67], but without pointing out the evidence to which it might be applicable, plaintiff argues that Dr. Reitz failed to procure her "informed consent" and, "independent of any other negligence,

an issue of fact was created which should have been submitted to the jury." Plaintiff thus raises the issue of "informed consent" in terms of negligence rather than in terms of a battery.[22] (For distinction, see Plante, *An Analysis of "Informed Consent"* (1968) 36 Fordham L.Rev. 639.) We have previously noted that plaintiff pleaded "informed consent" as a part of her cause of action sounding in medical negligence, which appears appropriate to the facts of this case (see Campbell, *Civil Liability for Investigational Drugs* (1969) 42 Temp. L.Q. 99, 143; Plante, *op. cit. supra,* at p. 641). Plaintiff also requested the giving of BAJI (5th ed.) No. 6.11, prior to the nonsuit, which is consonant with the negligence theory.[23]

*Berkey* is distinguishable on the facts and the law. The gravamen of a cause of action based on "informed consent" in terms of negligence is that the physician's failure or inadequacy of disclosure breached his duty of due care. The existence and scope of this duty normally must be established by expert testimony. (See: Plante, *op. cit. supra,* at pp. 656, 666; Note, *Informed Consent in Medical Malpractice* (1967) 55 Cal. L.Rev. 1396, 1399-1400, fn. 18.) We find no such expert testimony, which might be applicable to the nonsuit question, in this case. In the evidentiary posture of this case, the grant of nonsuit may not be disturbed on the theory of negligence or of "informed consent" as presented in this case.

## IV.

Frankly admitting that no authorities supporting her position have been found, plaintiff next contends that she should have been permitted to go to the jury on the theory that Dr. Reitz was, in a sense, a retailer of Enovid and that, therefore, strict liability in tort imposed on retailers of products (*Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168]) should have been applied. We do not agree.

Plaintiff does not claim that the Enovid was delivered to her and a charge made for it by the doctor, nor does she contend that the Enovid was chemically impure or in any condition other than that intended by the manufacturer. Its defect, if any, was only in the medical sense that it was not appropriate to her under the circumstances in which it was prescribed.

[22]We do not decide whether battery would lie in this case.

[23]The instruction concludes: "This duty [to make reasonable disclosure], however, is limited to those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition."

While the doctrine of strict liability in tort is no longer restricted to sales transactions (see, e.g., *Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251-252 [85 Cal.Rptr. 178, 466 P.2d 722] [applied to bailor]; *McClaflin* v. *Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446, 452-453 [79 Cal.Rptr. 337] [applied to lessor of personal property]; *Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319, 325-326 [82 Cal.Rptr. 420] [applied to one licensing use of washing machine]), some limitation to the scope of its applicability has received judicial recognition (see *Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680, 687 [81 Cal.Rptr. 519] [not applicable to "Good Housekeeping" seal, since indorser not directly involved in the manufacturing and distribution process and indorsement does not imply that it is based on examination or testing of specific item involved in lawsuit]). On the other hand, the distinction between a transaction where the primary objective is the acquisition of ownership or use of a product and one where the dominant purpose is to obtain services has not been obliterated. Where the services sought are professional in character, the distinction applies *a fortiori*.

Our former Chief Justice Traynor (author of the *Vandermark* opinion) drew the distinction in *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15]. In holding that there was no strict implied warranty liability on the part of a test hole digger who had erred in his opinion, he there stated: "He [the test hole digger] was not a seller of property who obligated himself as part of his bargain to convey property in the condition represented. The amount of his fee and the fact that he was paid by the hour also indicate that he was selling service and not insurance. Thus the general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct."

In *Magrine* v. *Krasnica* (1967) 94 N.J.Super. 228 [227 A.2d 539], affirmed 100 N.J.Super. 223 [241 A.2d 637], and 53 N.J. 259 [250 A.2d 129], the court approving the *Gagne* distinction declined to apply the doctrine of strict liability to a dentist whose drill, with a latent defect, broke while he was working on his patient and injured the patient. The court stated: "Of . . . meaningful significance is a recognition that the *essence* of the transaction between the retail seller and the consumer relates to the *article sold*. The seller is *in the business* of supplying the product to the consumer. It is that, and that alone, for which he is paid. A dentist or a physician offers, and is paid for, his professional services and skill. That is the *essence* of the relationship between him and his patient." (Italics in original; 94 N.J.Super at p. 235 [227 A.2d at p. 543].)

In *Babcock* v. *Nudelman* (1937) 367 Ill. 626, 629-630 [12 N.E.2d

635, 637], the Supreme Court of Illinois ruled that optometrists and oculists were not subject to the retailers' occupational tax imposed upon retailers of tangibles even though they sold lenses and frames in conjunction with their professional services. It stated: "If it becomes necessary for a physician to furnish medicine or surgical dressings in effecting a cure, he certainly does not thereby come within the designation of those engaged in a calling which would result in the imposition of a retail tax. . . . The main object and purpose of optometry is to furnish service to one requiring a correction of vision. . . . The lenses furnished are the result of skilled mechanical grinding and preparation. The ocular examination of the recipient of the service demands a high degree of skill. These things are the main objectives. While it is true that frames are furnished and their price considered in the ultimate attainment of the purpose, it is purely incidental to the main object sought to be accomplished." (367 Ill. at pp. 629-630 [12 N.E.2d at p. 637].)

The foregoing analogies lead us to conclude that there is a difference in status or classification between those upon whom the courts have heretofore imposed the doctrine of strict liability and a physician who prescribes an ethical drug to achieve a cure of the disorders for which the patient has sought his professional services. The former act basically as mere conduits to the distribution of the product to the consumer; the latter sells or furnishes his services as a healer of illnesses. The physician's services depend upon his skill and judgment derived from his specialized training, knowledge, experience, and skill. The physician prescribes the medicine in the course of chemotherapy only as a chemical aid or instrument to achieve a cure. A doctor diagnosing and treating a patient normally is not selling either a product or insurance. One of the requisites which the Restatement prescribes for the imposition of strict liability is that "the seller is engaged in the business of selling such product." (Rest. 2d Torts, § 402A.)

While we do not agree with everything in *Perlmutter* v. *Beth David Hospital* (1954) 308 N.Y. 100 [123 N.E.2d 792] (a suit against a hospital for furnishing blood in which jaundice-producing agents were found), we think the following quotation is apposite here: "The art of healing frequently calls for a balancing of risks and dangers to a patient. Consequently, if injury results from the course adopted, where no negligence or fault is present, liability should not be imposed upon [one] seeking to save or otherwise assist the patient." (308 N.Y. at p. 107 [123 N.E.2d at p. 795].) We, therefore, hold it inappropriate to impose liability without fault upon a medical doctor who prescribes a prescription drug as a medicine of his choice by applying the doctrine of strict products' liability merely because ingestion of the drug produced untoward results.

## V.

■ Plaintiff's argument that "the court erred with respect to rejection of testimony by respondent Reitz and such rejection denied appellants a fair trial" presents no basis for reversing the judgment of nonsuit in favor of Dr. Reitz. We have examined the portions of the testimony referred to by plaintiff in her brief without citation to where it is to be found in the reporter's transcript. ■ "The statement of any matter in the record shall be supported by appropriate reference to the record. . . ." (See rule 15(a), Cal. Rules of Court.) In absence of such appropriate references, the reviewing court is not obligated to make an independent search of the record. (*Kanner* v. *Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 564 [78 Cal.Rptr. 25].) ■ Having nevertheless made an independent review out of an abundance of caution, we find that a fair appraisal of the claim of error cannot be made unless the portions of the reporter's record quoted are set in proper context[24] to show what led to this ruling. In that context, we do not find merit to the contention. If there was any technical error committed, it was not prejudicial. The element of causation between the ingestion of Enovid and the development of pulmonary embolism was adequately established, at least for purposes of nonsuit, through the testimony of Doctors Samuels and Wilson so that no prejudice was suffered by plaintiff in this regard.

### Appeal Against Defendant Searle

The case against Searle was tried on the theory of strict liability in tort,[25] although admittedly the product involved (Enovid) was not adulterated, contaminated, or in any way not up to the manufacturer's intended standard. Cases such as footnoted below[26] are, therefore, not applicable. Plaintiff's assignments of error consist almost exclusively[27] of jury instructions

[24]These are pages A434 to A445 of the reporter's transcript.

[25]Plaintiff's causes of action (counts) pleaded against Searle sounded in negligence and in implied warranties of merchantability and fitness for the use intended. In terms of pleading after *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897], breach of an implied warranty comes under the Commercial Code (§ 2314, subd. (1)) and is different from strict liability in tort. (Cf. *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 431-432 [79 Cal.Rptr. 369], where appropriate amendment to pleadings was made; see Rapson, *Products Liability under Parallel Doctrines: Contrasts between the Uniform Commercial Code and Strict Liability in Tort* (1965) 19 Rutgers L.Rev. 692, 700.) Here, plaintiff abandoned all theories except strict liability in tort as it might be found among the allegations pleading implied warranties and their breach.

[26]E.g., *Grinnell* v. *Charles Pfizer & Co.* (1969) *supra; Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602 [6 Cal.Rptr. 320, 79 A.L.R.2d 290]; *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) 399 F.2d 121.

[27]Claim of error in that the trial judge prejudicially precluded plaintiff's counsel from eliciting an answer to a proper question put to Dr. Reitz under Evidence Code

refused or jury instructions given. The order in which these are taken up seriatim is not the same as in plaintiff's brief. Upon consideration of the contentions of error advanced by plaintiff, we have concluded that the judgment in favor of Searle should be affirmed for the reasons we shall set forth below.

## I.

To put the foregoing assignments of error dealing with jury instructions in proper perspective, it becomes necessary to set forth some additional facts. The recital is not intended to be comprehensive,[28] but just enough to show how the instructions or proposed instructions discussed below came into issue.

The plication of plaintiff's vena cava inferior performed on June 14, 1964, by Dr. Gaspar was successful. Post-operatively, plaintiff was placed on Coumadin, an anticoagulant drug, by Dr. Dahlquist, who further instructed plaintiff to wear elastic stockings. She remained under Dr. Dahlquist's care, notwithstanding the fact that she had named him as a defendant in this action filed on May 3, 1965. When Dr. Dahlquist saw her on March 1, 1966, plaintiff had made an excellent recovery from her 1964 problems. She was not on any anticoagulant,[29] and was not wearing elastic stockings. He was informed by plaintiff that she was able to walk, hike, swim, and engage in similar activities, which he had encouraged her to undertake. He had interdicted only heavy lifting and the like. She had no varicose veins at that time. She was working full time.

On May 13, 1967, plaintiff suffered a thrombophlebitis of the right calf. She had last ingested Enovid just prior to her admission to the Long Beach Community Hospital on June 10, 1964. It was almost one year after plaintiff had been completely taken off of anticoagulant therapy in July 1966. Plaintiff returned to Dr. Dahlquist for treatment; he again placed her upon Coumadin and a tranquilizer to minimize the risk of another pulmonary embolism.

While still under Dr. Dahlquist's treatment, plaintiff was referred by her attorneys in this action to Dr. Arthur Samuels for the purposes of his conducting a clinical experimental study on plaintiff involving the use of Enovid. He testified that because the May 13, 1967, thrombophlebitis was "spontaneous," there was some question as to its cause. One purpose of the

section 776 examination appears to be directed to the appeal against Searle as well as against Dr. Reitz. The contention has been answered in our opinion in our resolution of this question in connection with the appeal against Dr. Reitz.

[28]The reporter's transcript alone runs 2,348 pages, not to speak of the voluminous exhibits.

[29]There is also testimony of Dr. Dahlquist when he states that Coumadin was tapered off and finally "shut off completely" in July 1966.

study was to either prove or disprove a causal relationship between Enovid and plaintiff's thrombophlebitis and pulmonary embolism. He also knew that another purpose of the experiment was to enhance plaintiff's position in this action.

*July 11, 1967.* Dr. Samuels saw plaintiff for the first time. He took a detailed (some 10 pages) history from her, but he, like Dr. Reitz, did not pick up plaintiff's chest ailments of 1961 and 1963 other than as "flu" and accepted that to be true. A large blood specimen was taken for laboratory test purposes. On this date, Mr. Wolfe, plaintiff's associate counsel who had referred plaintiff to Dr. Samuels, advised the latter to keep this hematological consultation private and to refrain from contacting Dr. Dahlquist until further notice from Mr. Wolfe.

*July 12, 1967.* Dr. Samuels examined plaintiff physically. Although he found a rather prominent pulmonary sound (P-2), an indication that something might be wrong with her pulmonary circulatory system, he concluded that plaintiff was "medically asymptomatic and in a reasonable state of clinical equilibrium while taking her daily anticoagulant and tranquilizer therapy."

*July 18, 1967.* Actual studies were commenced. Another blood specimen was taken and laboratory tests thereon performed. Plaintiff told Dr. Samuels that she was experiencing pain in the lower right side of her chest. At this time, Dr. Samuels attributed these pains to anxiety-imagination. In retrospect, Dr. Samuels diagnosed these complaints as indicative of "thrombi and emboli possibly to lung for two weeks prior to discontinuation of Coumadin," and that plaintiff had "presence of pulmonary emboli" on July 18.

*July 24, 1967.* Plaintiff stopped taking Coumadin upon Dr. Samuels' direction. Mr. Wolfe instructed Dr. Samuels that he would now be permitted to contact plaintiff's personal physician.

*July 25, 1967.* Although good clinical practice called for tapering off when taking a patient off of an anticoagulant, Dr. Samuels in this instance suddenly stopped plaintiff's ingestion of Coumadin. He was aware of the hazard that thrombophlebitis could result from the "rebound" or "overshoot" reaction from suddenly stopping the taking of Coumadin. But he had advised plaintiff of this hazard as well as the hazard of having plaintiff take Enovid. In fact, this study on plaintiff was "a very hazardous life-threatening study." He testified that he informed both plaintiff and her husband of the risks involved. And according to him, plaintiff realized that to get her answers to her problems, "she might have to further submit herself to further hazards." Dr. Samuels had plaintiff execute a so-called

written informed consent form on this date (July 25, 1967), which was witnessed by Dr. Samuels' office manager. Dr. Samuels phoned the Harriman-Jones Clinic on this date, but was informed that Dr. Dahlquist was out of town and would not be back for two weeks from the time he had left.

*July 27, 1967.* Plaintiff was still having pain in her mid-epigastrium and her lower chest.

*July 28, 1967.* Dr. Samuels noted an acceleration of blood clotting time in plaintiff after the discontinuance of the anticoagulant and tranquilizer. He also wrote a letter informing Dr. Dahlquist that he had "recommended" discontinuance of the anticoagulant therapy. He did not tell Dr. Dahlquist that it had in fact been discontinued, and that it had been discontinued abruptly. (Dr. Dahlquist testified that when he first heard of the sudden termination of the anticoagulant, his reaction was, "Oh, My God!") Dr. Samuels did not inform Dr. Dahlquist that one purpose of the study was to enhance plaintiff's position in this lawsuit against him. He did not inform Dr. Dahlquist of his intention of using Enovid in the study.

*August 2, 1967.* Dr. Samuels first talked to Dr. Dahlquist over the telephone.

*August 3, 1967.* Plaintiff was given one 10 milligram tablet of Enovid out of the 1964 container. No chemical assay of the tablets was made. Plaintiff also took one tablet daily on August 4, 5, 6, 7, 8, 9, 10, and 11, 1967.

*August 7, 1967.* Dr. Samuels noted that plaintiff reported to him as feeling nauseous and having abdominal pain. She was afraid. The pain did not resemble the pain of 1964, although the nausea did.

*August 8, 1967.* Dr. Samuels noted: patient reports symptoms of discomfort in the right calf. "Telephone conversation from Mr. Carmichael. Upset about lack of definiteness of effect of Enovid—patient not experiencing same effects—patient upset about not experiencing same effects— as two years ago and not producing results."

*August 9, 1967.* Dr. Samuels held a conference with Mr. Carmichael and Mr. Wolfe as to whether clinical study should be continued. Apparently, it was decided that it should be. Communication of the decision to plaintiff was left up to Mr. Carmichael.

*August 10, 1967.* Dr. Samuels noted: "Discomfort in right side of chest, particularly on deep breathing, particularly in back. Coughed up spot of blood in a.m. once. Tenderness in right calf." He testified that there was a Homan's sign, definitely showing thrombophlebitis and recurrent pulmonary emboli. He gave plaintiff the choice of taking or not taking the Enovid pill

that day. Plaintiff chose to go ahead. She told him: "I am not getting the same reaction at all as before although I have a lot more fear."

*August 11, 1967.* Plaintiff took another Enovid pill. At this time Dr. Samuels had a thorough discussion with plaintiff; he warned her of the hazards of further continuing with the studies. At the same time he informed her that there were now good theoretical grounds on which "to expect that she might now demonstrate maximum sensitivity to Enovid." On this date she had thrombophlebitis in both legs. Plaintiff was re-started on her anti-coagulant and tranquilizer therapy. She was given a maximum dose (4 tablets; 20 milligrams) of Coumadin and instructed to thereafter take 2 tablets (total of 10 milligrams) daily. Plaintiff turned out, however, to be "particularly resistant to anticoagulant therapy" so she was given 4 tablets for 3 days and 3 tablets per day for the balance of the week. She was given as much as 25 milligrams on one occasion. Dr. Samuels instructed her to return to Dr. Dahlquist on August 12 and then report back to him the following Monday.

In the meantime, diagnosis of endometriosis had been confirmed at the UCLA Medical Center. Dr. Samuels agreed that Enovid is a treatment for endometriosis.

*August 17, 1967.* Dr. Samuels received confirmation from Dr. Dan Simmons, a pulmonary expert, that Dr. Simmons' studies (which included a lung scan on August 17, 1967) were partially complete. The lung scan indicated "a far advanced degree of pulmonary disease particularly on the right, including lower base."

Plaintiff required a "ligation" operation as a result of her 1967 pulmonary embolisms, in which her inferior vena cava was entirely tied off. Dr. Samuels testified: "Very unexpectedly Mrs. Carmichael suffered a minimum of symptoms right after surgery, of which we were terribly delighted, and since that time has done extremely well." At the time she was examined by Dr. Joseph Boyle, an internist, on behalf of defendant Searle in 1969, plaintiff was working. He opined that plaintiff should be able to carry on life "in a completely normal fashion without any difficulty."

The question, whether Enovid caused plaintiff's thrombophlebitis and pulmonary embolism in 1964 or whether it was due to her idiosyncratic hypersensitivity resulting from her endometriosis and abnormal blood clotting time, was hotly disputed. On direct examination, Dr. Samuels stated: "I believe that Mrs. Carmichael was *uniquely sensitive* to Enovid and sustained an adverse effect on her blood-clotting mechanism as a result of that ingestion," which would make Enovid medically defective in her case. (Italics added.) On cross-examination he stated that he thought plaintiff's

endometriosis was a substantial factor in causing her thromboembolism. The blood factor changes induced by taking Enovid would have no clinically significant effect on normal women. On redirect examination, however, he believed that Enovid rather than the endometriosis was the causative factor producing the 1964 pulmonary embolism. A biochemist, Laurence Pilgeram, Ph.D., and Dr. John D. Wilson, a board-certified general surgeon, testified in support of the theory that Enovid was the cause.

On behalf of Searle, Dr. Robert W. Kistner, board-certified in obstetrics and gynecology, testified that there was no cause-and-effect relationship between Enovid and intravascular clotting, thromboembolism, or pulmonary embolism. He did not think the studies introduced into evidence established any definitive causal relationship. The pulmonary embolism in this case was not due to the ingestion of Enovid; the two events were coincidental. Dr. Joseph Boyle, an internist specializing in heart and lung disease, testified that plaintiff's pulmonary embolism in 1964 was caused by a chronic pelvic thrombophlebitis which had existed over a period of years. He noted the possibility of endometriosis itself having caused the thrombophlebitis in this case. The sudden discontinuance of Coumadin in the course of Dr. Samuels' clinical experimental study aggravated the plaintiff's problems due to her 1967 right calf thrombophlebitis episode. Dr. Herbert S. Sise, an internist specializing in cardiology and thrombosis, had no opinion as to the cause of the 1964 thromboembolism. His own studies performed in 1964 disclosed no really significant changes in the blood of women who took Enovid. He criticized Dr. Samuels' study as inadequate for lack of proper control data. Gerard Lanchantin, Ph.D., a biochemist, testified showing wherein biochemist Pilgeram's study was inadequate.

## II.

Plaintiff contends that the trial judge erred in refusing to give BAJI 9.00 and another instruction based on language found in *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 53 [46 Cal.Rptr. 552].[30]

---

[30]BAJI 9.00 as requested read: "The manufacturer of an article who places it on the market for use under circumstances where he knows that such article will be used without inspection for defects in the particular part, mechanism, or design which is claimed to have been defective, is liable for injuries proximately caused by defects in the manufacture or design of the article which caused it to be unreasonably dangerous and unsafe for its intended use and of which the user was not aware, provided the article was being used for the purpose for which it was designed and intended to be used. [¶] An article is unreasonably dangerous if it is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. [¶] The plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove each of the foregoing conditions."

The proposed instruction based on *Canifax* read: "Under the foregoing rule as

Neither BAJI 9.00 nor the proposed instruction based on *Canifax* was apposite to the situation presented here, namely, one involving an ethical drug (one obtainable only by prescription), which is free from any adulteration, contamination, or nonconformity with the manufacturer's intended standard. It is, of course, hornbook law that in civil cases, the trial court is under no obligation to modify or recast proffered instructions to make them applicable and it may reject them if the portions thereof which correctly state the applicable law are covered by other instructions given. (See, e.g., *L. A. County Flood etc. Dist.* v. *McNulty* (1963) 59 Cal.2d 333, 337 [29 Cal.Rptr. 13, 379 P.2d 493]; *Hart* v. *Farris* (1933) 218 Cal. 69, 75 [21 P.2d 432]; cf. *Menchaca* v. *Helms Bakeries, Inc.* (1968) 68 Cal.2d 535, 543 [67 Cal.Rptr. 775, 439 P.2d 903].) The portions of these plaintiff's proposed instructions which were applicable to the case were covered in other instructions which were given as we shall point out below. (See Searle's proposed instruction No. 2 and portion of No. 1 which were given.)

### III.

The trial judge gave the instructions noted below[31] on the substantive aspects of the law pertaining to prescription drugs. Plaintiff contends that the portion labeled "Instruction No. 6" was a formula instruction

---

stated to you, a product although faultlessly made, may nevertheless be deemed 'defective' if the product is unreasonably dangerous to place in the hands of a user without a suitable warning as to the danger involved in the use of the product."

[31]"(INSTRUCTION No. 2) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. This is so although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

As a part of the instruction on burden of proof the trial judge gave the following (portion of instruction No. 1): that plaintiff had the burden of proving that Enovid as administered to plaintiff was "dangerous to an extent beyond that which would be contemplated by her physician who purchases it, with the ordinary knowledge common to the medical community as to its characteristics."

"(INSTRUCTION No. 6) The Seller of a product is liable only when the defective condition of the product makes it unreasonably dangerous to the user or consumer. Some drug products cannot possibly be made entirely safe for all consumption. [¶] In the field of drugs such a product, properly prepared, and accompanied by proper directions and warning is not defective, nor is it necessarily unreasonably dangerous. It may be that the marketing and use of the drug, notwithstanding a medically recognizable risk, is justifiable in certain instances. [¶] It is for the jury to determine whether or not the drug is properly prepared and marketed and proper warning is given. [¶] In deciding, therefore, whether Enovid is or is not an unreasonably dangerous product, it will be necessary for the jury to balance the benefits, if any, against the risks if any which are inherent in its use."

and that it was argumentative. We disagree. We find it to be merely a statement of the law on how to determine whether a prescription drug is defective or unusually dangerous so as to render it a defective product as discussed in the Restatement Second of Torts, section 402A and comments thereunder. Since our research has disclosed that the Restatement is the sole authority which discusses this matter exhaustively, we set the section and pertinent comments *in extenso* below.[32]

[32]Section 402A: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. (2) The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product, and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The comments to section 402A pertinent to this case are:

"i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from overconsumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fusel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous."

"j. *Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

"But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

"Where warning is given, the seller may reasonably assume that it will be read and

While there are some cases which intimate that the elements of an adequate warning as discussed in comment j apply only to the theory of liability bottomed on negligence (e.g., *Love* v. *Wolf* (1964) 226 Cal.App. 2d 378, 402-403 [38 Cal.Rptr. 183]; *Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645, 650, fn. 4 [77 Cal.Rptr. 709]), these cases overlook the requirement of notice in comment k as part of the substantive law requisite to render a prescription drug not defective nor unreasonably dangerous. Moreover, concepts from negligence law have been amalgamated into the doctrine of strict liability, as we point out more fully later.

■ *Toole* v. *Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 710-711 [60 Cal.Rptr. 398], correctly states the law: "Whether or not the vendor of a prescription drug is to be exempt from strict liability depends upon the facts surrounding the manufacture and sale of the product. If the vendor has properly prepared the product and has accompanied its sale with proper directions and warnings, he will not be held to strict liability for unforeseen results. But where the facts disclose that the drug has not

---

heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."

"k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

"n. *Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery."

been properly prepared or has been placed upon the market and sold without adequate and proper warning, strict liability for resulting injury may be found."

 It is the general rule that the duty of adequate warning by the manufacturer of an ethical drug is discharged by its warning of hazards to doctors who may in the exercise of their medical judgments decide to use the drug as a part of their chemotherapy. (*Love* v. *Wolf* (1964) *supra*, 226 Cal.App.2d 378, 394-395; *Magee* v. *Wyeth Laboratories, Inc.* (1963) *supra*, 214 Cal.App.2d 340, 350, 352; accord: *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) *supra*, 399 F.2d 121, 130; *Basko* v. *Sterling Drug, Inc.* (2d Cir. 1969) 416 F.2d 417, 426.) Absent special circumstances, known or foreseeable in the exercise of due care by the manufacturer, there is no duty to warn the patient. (*Love* v. *Wolf, supra; Magee* v. *Wyeth Laboratories, Inc., supra.*)

The rationale of the foregoing rule is: "(1) The doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor. (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug, thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient."[33] (Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability* (1964) [hereafter cited as Rheingold] 18 Rutgers L.Rev. 947, 987.)

However, if the promotional features of communications to the doctors by the manufacturer unfairly and unreasonably predominate, a warning otherwise adequate may become inadequate and the adequacy of the warning may present a jury question. (*Love* v. *Wolf* (1964) *supra*, 226 Cal.App.2d at p. 400.)

 Because of the foregoing law, it is the prescribing doctor who in reality stands in the shoes of "the ordinary consumer." Consequently in the situation presented here, it was not error to instruct the jury that Enovid had to be "dangerous to an extent beyond that which could be contemplated by her physician who purchases it, with the ordinary knowledge common to the medical community as to its characteristics."

 There is no justification for the statement in plaintiff's brief:

---

[33]In this connection see Health and Safety Code section 26662; 21 United States Code Annotated section 353, subdivision (b) (2).

"The evidence in this case conclusively proves there was no adequate warning." While the record reflects that plaintiff's counsel adroitly circumvented the precautions under Enovid in the Physicians' Desk Reference (PDR) (1964 edition copyrighted 1963) from being read into the record as he was examining the witness Bartlett, Dr. Reitz testified[34] that he had received Exhibit "M" (for identification).[35] Exhibit "A," as well as Code 364 dated March 16, 1964, attached to Exhibit "A," listed under contraindications: "3. *Previous Thrombophlebitis or Pulmonary Embolism.* Enovid is contraindicated in these patients unless the reason for its use in the judgment of the physician is overwhelming." Under precautions, the warnings set forth in the margin[36] were given. Whether the contraindica-

[34]This was subsequent to the time he was granted a nonsuit.

[35]In lieu of receiving "M" into evidence, it was agreed that the product literature put out by Searle, described as Code 364, March 16, 1964, be attached to Exhibit "A" already in evidence.

[36]"That several hundred instances of peripheral thrombophlebitis and embolism, including fatalities due to embolic phenomena, have occurred in women receiving Enovid has received considerable attention. The possible causal relationship of Enovid administration to these incidents has received much study and has been reviewed by four committees of recognized authorities.

"Any relationship between a state of 'hypercoagulability' and thromboembolic disease still remains undetermined. In any event, presently available data do not establish—or exclude—the possibility that Enovid produces hypercoagulability as defined by increases in components or acceleration of clotting kinetics. A number of blood coagulation factors are known to be modified during normal pregnancy. These include fibrinogen, fibrinolysin, prothrombin, factors VII, VIII and X, and other complicated measurements of the blood coagulation mechanism. Enovid also produces changes in these factors in the same directions as those observed during pregnancy. Although the significance of these changes is presently unknown, additional studies are in progress.

"Enovid was first distributed commercially in June 1957. As of June 1963, somewhat more than 400 thromboembolic episodes have been reported among Enovid users with thirty-seven fatalities in the United States as a result of the development of pulmonary embolism. On further investigation some of these cases and fatalities were unrelated to thromboembolic disease or the histories revealed definitive and generally-recognized causes for the development of the reported condition. Among the fatalities, more than one-third could be classified as idiopathic or having no clear cut (precipitating) etiologic factor.

"Available medical and statistical evidence relative to the incidence of thromboembolic episodes in non-medicated and nonpregnant women of childbearing age is singularly sparse and not completely reliable. Studies are in progress to attempt to rectify this defect in knowledge of the incidence of thrombophlebitis and pulmonary embolism in this segment of the female population. The *expected* incidence of thromboembolic episodes in 'healthy' young women is difficult to determine from the available data but there is evidence that in such women in the age range of 20 to 44 years, not subjected to trauma and not pregnant, 926 cases of thrombophlebitis per million per year will occur, that among these sixty cases of pulmonary embolism will be seen and that 7.9 will die as a result of thrombophlebitis or pulmonary embolism.

"A recent panel survey (Feb.-Aug. 1963, J.A.M.A. 185:776 [Sept. 7] 1963) in analyzing the 1962 fatalities by age groups did not find a statistically significant increased rate of fatalities in any age group. Since the possibility of a real increase

tions and precautions listed in Code 364, dated March 16, 1964, which was admitted into evidence as part of Exhibit "A," constituted an adequate warning to Dr. Reitz was one of the issues for the jury to determine. If an adequate warning is received by the person to whom the law requires that the warning be given, the manufacturer may assume that it will be read and heeded. (*Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) *supra,* 272 Cal.App.2d 645, 649.)

## IV.

▮ Plaintiff complains of the giving of the instruction which stated that Searle had the burden of proving that plaintiff and Dr. Samuels were aware of any dangers in the use of Enovid by plaintiff in August 1967 and that they "nevertheless proceeded to make use of Enovid despite such knowledge." ▮ She strenuously argues that the concept of assumption of risk properly belongs to a negligence theory of recovery and has no place in strict liability, detailing the requirements for invoking "assumption of risk" in negligence cases. We have already seen that a special type of "contributory negligence" or "assumption of risk" has its place as a defense to a claim of strict liability. (See Rest. 2d Torts, *supra,* § 402A, com. n.) The California authorities are in accord. (See *Martinez* v. *Nichols Conveyor etc. Co.* (1966) 243 Cal.App.2d 795, 799-800 [52 Cal.Rptr. 842]; Witkin, Summary of Cal. Law (1969 Supp.) p. 775.) If a user or a consumer discovers a defect in the article and is aware of the dangers of such defect, but nevertheless proceeds to unreasonably make use of the product and suffers injury by it, he may not recover.

▮ Here, plaintiff was seeking damages not only for the pulmonary episode of June 1964, but also for episodes following the experimental studies Dr. Samuels conducted on plaintiff by having her ingest Enovid for nine days in August 1967, at a time when he knew that plaintiff had previously suffered thrombophlebitis, when he had the benefit of her previous history, when the extent of available medical literature was much more extensive than in 1964, and when the need for prescribing Enovid, by his

---

especially in the older age group remains this should be carefully weighed by the physician prescribing Enovid. Further data will be evaluated and reported.

"There is abundant evidence in the literature to support the concept that the incidence of thrombotic episodes increases with age, with parity, with obesity, with a history of previous occurrences, with a history of varicose veins or other vascular abnormality, with trauma or unusual activity, and with restricted movement combined with an interference with the dependent circulation (long automobile or airplane trips). Similar causal or contributory factors have been noted in the histories of many of the cases reported as occurring during Enovid administration. Women subject to such exposures or exhibiting these characteristics should be considered as being at risk of thrombosis."

Exhibit "A," aside from the foregoing, under the description of Code 264, March 5, 1964, carried a similar precaution, which was read into the record at pages A250 to A252 of the reporter's transcript.

own admission, was not overwhelming. Consequently, this contention of error lacks merit.

## V.

Plaintiff urges that the instruction on concurrent causation set forth in the margin[37] and requested by her should have been given. While a properly worded instruction on concurrent causation might have been appropriate, the indicated instruction concluded with the sentence: "It is no defense to G. D. Searle & Co. that the *negligent conduct of a person not now a party* was also a proximate cause of the injury." Whether plaintiff had in mind Dr. Reitz, Dr. Dahlquist, Dr. Samuels, or some other person, this instruction standing alone was of no guidance to the jury without further instructions defining professional negligence or malpractice, which might be "negligent conduct" in the context of this case. In this connection, it should be remembered that plaintiff withdrew her request for BAJI 6.00 (Duty of Physician and Surgeon), 6.01 (Duty of Specialist), 6.10 (When Consent to Operation or Treatment is Necessary), 6.11 (Reality of Consent—Physician's Duty of Disclosure), and 6.35 (Medical Malpractice—Conditional Res Ipsa Loquitur). The proffered instruction on concurrent causation without some or all of these instructions would have left the jury confused or free to speculate as to what conduct, of a person not now a party, was negligent. The request was, therefore, properly denied.

Plaintiff next contends that the instruction that it was incumbent upon plaintiff to prove by a preponderance of the evidence "that the injuries claimed . . . were not the result of an allergy or peculiar sensitivity common only to an insubstantial percentage of the population who might use Enovid" "is not a correct statement of the law and is misleading." It might have been misleading in the sense that it should not have been made a separate and distinct issue, but we do not feel that it was prejudicial error under the circumstances in which it was given, namely, in conjunction with plaintiff's requested instruction that plaintiff had the burden of proving that Enovid was defective and that such defect was a proximate cause of plaintiff's injury and Searle's requested instruction that plaintiff had the burden of proving "the Enovid ingested by [plaintiff] was unreasonably

---

[37]"There may be more than one proximate cause of an injury. When conduct of two or more persons or corporations contributes concurrently as proximate causes of an injury, the conduct of each of said persons or corporations is a proximate cause of the injuries regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. It is no defense to G. D. Searle & Co. that the negligent conduct of a person not now a party was also a proximate cause of the injury."

dangerous."[38] Plaintiff does not quarrel with the instruction: "The drug product, Enovid, can be used by persons only upon the prescription of a doctor."

The instruction as given was one approved by the California and other courts upon implied warranty of merchantability and fitness for use. (*Harris* v. *Belton* (1968) 258 Cal.App.2d 595, 606-607 [65 Cal.Rptr. 808]; *Magee* v. *Wyeth Laboratories, Inc.* (1963) *supra,* 214 Cal.App.2d 340, 352; accord, e.g., *Merrill* v. *Beaute Vues Corporation* (10th Cir. 1956) 235 F.2d 893, 898.) Even the case cited by plaintiff, *Crotty* v. *Shartenberg's-New Haven, Inc.* (1960) 147 Conn. 460 [162 A.2d 513], reaffirms this rule. (See also: BAJI (5th ed. 1969) No. 9.70.) The cases do carry over the implied warranty rules relative to personal idiosyncratic sensitivity of the user of drugs and chemicals to the strict liability field. (See, e.g., *Lewis* v. *Baker* (1966) 243 Ore. 317, 322 [413 P.2d 400, 403]; *Oakes* v. *E. I. Du Pont de Nemours & Co., Inc.* (1969) *supra,* 272 Cal. App.2d 645, 651; see Rest. 2d Torts, § 402A, comment j; Prosser on Torts (3d ed. 1964) ch. 19, § 97, p. 684.) In absence of a showing that the manufacturer knew or should have known by reasonable "developed human skill and foresight" that the drug is dangerous, the court in *Oakes* stated that "to exact an obligation to warn the user of unknown and unknowable allergies, sensitivities and idiosyncracies would be for the courts to recast the manufacturer in the role of an insurer." (272 Cal.App.2d at p. 651.) Except for the *Magee* case, the others cited immediately above, did not deal with prescription drugs. But whether the drug in question is a pro-

---

[38]The instruction which the court gave on the burden of proof and preponderance of evidence was a combination of the requests by both sides (with modification of that portion requested by Searle).

The portion taken from plaintiff's request: "In this action, the plaintiff has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: That Enovid was defective; That such defect was a proximate cause of injury to plaintiff. . . ."

The portion taken from Searle's request: "That the Enovid ingested by [plaintiff] was unreasonably dangerous. That is, dangerous to an extent beyond that which would be contemplated by her physician who purchases it, with the ordinary knowledge common to the medical community as to its characteristics. [¶] That the Enovid ingested by [plaintiff] was the proximate cause of the injury and damages claimed by plaintiffs. [¶] That the injuries claimed by [plaintiff] were not the result of an allergy or peculiar sensitivity common only to an insubstantial percentage of the population who might use Enovid.

"The defendant has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issue: That plaintiffs, and Dr. Samuels, were aware of any danger in the use of Enovid by [plaintiff] in August 1967, and nevertheless proceeded unreasonably to make use of Enovid despite such knowledge."

These were followed by paragraphs defining the meaning of preponderance of evidence and instructing the jury that in determining that issue all of the evidence should be considered regardless of who produced it.

prietary drug (available without prescription) or an ethical drug (available only upon prescription), the matters concerning allergies, hypersensitivities, and physical idiosyncracies of the ultimate user, which raise many difficult problems (see Prosser, *op. cit.,* at pp. 668-669), should be treated as just another factor in the issues of "duty to warn, duty to know, and duty to test" (Rheingold, (1964) 18 Rutgers L.Rev. 947, 1005). (See also 3 Frumer and Friedman, Products Liability (1970) § 33.02 [4].)

As we have earlier pointed out, the manufacturer of an ethical drug discharges its duty of warning if it adequately warns the doctor who may in the exercise of his medical judgment use the drug as a part of his chemotherapy, and there is no duty to directly warn the patient. Whether Enovid was a defective or unreasonably dangerous drug in treatment of plaintiff's endometriosis in 1964 was incumbent upon plaintiff to prove. As part of that proof, she had the burden of proving that Searle's warning to Dr. Reitz was inadequate. Insofar as proving the inadequacy of the warning is concerned, plaintiff would have to show that a warning of adverse effects to a woman of her physical idiosyncracies and hypersensitivity was incumbent upon Searle and that it failed to give such a warning. In that sense, plaintiff did have the burden of proof and the instruction in this regard was not inaccurate.

In this connection, the record reflects that the objection to this portion of defendant's proposed instruction was not specifically made. The objection was to the whole of defendant's proposed instruction number one: "We object to number one because it includes issues which are irrelevant. So if your Honor just wants to make a note, I object to number one." Plaintiff's counsel likewise objected to a detailed discussion of the instructions proposed by defendant and the trial judge's decision as to whether he would give them.[39] Under these circumstances we very much doubt that plaintiff is now in a position to raise a specific objection to the portion of the instruction which was given. Although it might more properly have been omitted, its having been given would not warrant a reversal of the judgment.

### Disposition

For the reasons which we have set forth in the foregoing opinion, both the judgment of nonsuit in favor of defendant Dr. Reitz and the judgment

---

[39]"Mr. Harrington [one of Searle's counsel]: I thought it would take some time to go over all these matters and that is why I suggested that the jury might be excused for the rest of the day.

"Mr. Harney: It seems to me, your Honor, that they have gone over the instructions. I made my objections on the record. I don't know why we have to talk about them all day long."

entered in favor of defendant Searle upon the jury verdict in its favor should be affirmed.

Both judgments appealed from are affirmed.

Stephens, Acting P. J., and Reppy, J., concurred.

A petition for a rehearing was denied June 22, 1971, and appellants' petition for a hearing by the Supreme Court was denied August 18, 1971. Schauer, J.,* sat in place of Tobriner, J., who deemed himself disqualified.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.