[Civ. No 37418. First Dist., Div. One. Mar. 31, 1977.]

ORPHA MAE FOGO et al., Plaintiffs and Appellants, v.
CUTTER LABORATORIES, INC., Defendant and Respondent.

**COUNSEL**

Cartwright, Saroyan, Martin & Sucherman and Robert U. Bokelman for Plaintiffs and Appellants.

O'Connor, Cohn, Dillon & Barr and James L. English for Defendant and Respondent.

## OPINION

**WEINBERGER, J.**\*—This is an appeal from a judgment in a wrongful death action, entered upon a jury verdict in favor of respondent, Cutter Laboratories, Inc., and from an order denying appellants' motion for a new trial. Plaintiffs and appellants are the surviving widow and adult children of James D. Fogo who died from viral hepatitis a little over two months after having been injected with a plasma product known as Konyne, developed and introduced by Cutter Laboratories, Inc., in 1969.

James Fogo had suffered throughout his life from a mild form of hemophilia as the result of which he experienced more bleeding episodes from lacerations and trauma than would normal persons. Although the condition was not life-threatening he had a history of bleeding following tooth extractions, when the sockets would ooze some blood for periods as long as two weeks.

The complaint filed in Alameda County against Cutter Laboratories alleged five causes of action, the first for negligence, the second for breach of an express warranty, the third for breach of an implied warranty of merchantability, the fourth for strict liability, and the fifth incorporating the prior four causes of action and alleging that because defendant acted maliciously and wilfully, plaintiffs should be awarded punitive damages. At the conclusion of the plaintiffs' case defendant moved for a nonsuit on the express warranty cause of action. The reporter's transcript records the court as stating, "I will reserve my ruling in connection with it." However, the minute order dated November 12, 1974, and the record for the same day, indicate that the motion was granted. The case went to the jury on November 14, 1974, and the court instructed the jury on negligence, but refused plaintiffs' instructions on express warranty, on strict liability, and a proposed instruction regarding liability of a manufacturer when an intervening act of the physician is reasonably foreseeable.

■ Before discussing the issues raised by appellants' appeal from the judgment entered against them upon the jury's verdict disposition shall be made of the purported appeal from the trial court's order denying appellants' motion for a new trial. The complete answer is contained in 6 Witkin, California Procedure (2d ed. 1971) Appeal, section 71, pages 4084-4085, as follows: "Since the 1915 amendment to former C.C.P. 963

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

an order denying a new trial has been nonappealable. 'The purpose of the legislature evidently was to obviate the delays incident to the prosecution of two separate appeals in a single action in so far as proceedings for new trial are concerned, and to provide that such proceedings should be reviewable upon the appeal taken from the judgment.' (*Hughes v. De Mund* (1924) 195 C. 242, 247, 233 P. 94; see also *Confar v. Whelan* (1935) 8 C.A.2d 101, 104, 46 P.2d 991; *Marr v. So. Calif. Gas Co.* (1924) 194 C. 332, 336, 228 P. 534; *Hamasaki v. Flotho* (1952) 39 C.2d 602, 608, 248 P.2d 910; *Rodriguez v. Barnett* (1959) 52 C.2d 154, 156, 338 P.2d 907 ['The appeal was dismissed from the bench with an admonition from the Chief Justice to counsel and to members of the bar generally to cease appealing from such an obviously nonappealable order'].)"

In conformity with well established and reasonable appellate procedure we dismiss the purported appeal from the order denying the motion for a new trial and go on to a discussion of the appellants' contentions on their appeal from the judgment.

### STATEMENT OF FACTS

Prior to September 8, 1971, James D. Fogo was sent to the University of Kansas Hospital at Kansas City, Kansas, where his condition was diagnosed. Dr. Larsen, a hematologist with that facility, recommended to Dr. Schlotterback, the treating general practitioner in Mankato, Kansas, "that if surgery were contemplated then therapy with fresh frozen plasma or the new Factor IX Konyne could be used."[1]

On September 8, 1971, Dr. Schlotterback administered Konyne to Mr. Fogo approximately one hour prior to an extraction of a tooth. The result was an increased efficiency of clotting, and Mr. Fogo stopped bleeding within two hours after the extraction. However, on November 4, 1971, the patient returned to Dr. Schlotterback's office complaining of a fever, a rash, headaches, a cough, and general aching all over. Dr. Schlotterback diagnosed his condition as an unknown flu symptom and suggested rest.

---

[1]Dr. Larsen's letter, in part, reads as follows: "It is obvious that this patient has a Factor IX deficiency (Christmas disease). This hemophilia B, as it is sometimes called, usually is a mild disease and with his 20% activity this gives the reason for his very minimal problems during his life. There is no therapy indicated for this with the exception of the fact that if surgery were contemplated then therapy with fresh frozen plasma or the new Factor IX Konyne could be used."

Mr. Fogo returned the following evening and advised that his urine was darker than normal. Dr. Schlotterback took a urine specimen, noted that it had bile, and admitted the decedent to the Jewell County Hospital with a provisional diagnosis of probable serum hepatitis. As the facilities there were inadequate, Fogo was transferred to St. Joseph's Hospital in Concordia, Kansas, on November 8, 1971. There he died on November 14, 1971, from viral hepatitis.

At the trial Dr. Milton Mozen, a Ph.D. in biochemistry employed by Cutter Laboratories as director of chemical and biological research, testified that Konyne is a Factor IX concentrate developed by Cutter through use of a fractionation process wherein this particular coagulation factor is removed from plasma extracted from the pooled blood obtained from thousands of donors. Because there is an insufficient number of volunteer donors, Cutter Laboratories is required to use plasma from paid donors, and operates plasmapheresis centers located throughout the United States where plasma from paid donors is collected.

The hepatitis virus is undetectable. Dr. Mozen testified that while some plasma products can be made in processes which allow for the destruction of the hepatitis virus, those processes cannot be conducted in the production of Konyne because it would lose its coagulation activity. Cutter Laboratories' witnesses acknowledged that the risk of hepatitis is higher in commercial than in volunteer plasma, and it is also higher where plasma is pooled. Because of the hepatitis risk, warnings appear on the box and in the package insert and on the label of Konyne, which is obtainable only on doctor's prescription.

## DISCUSSION

■ We consider first the question of whether the doctrine of strict products liability is applicable in the instant case. Specifically, appellants appeal from the trial court's refusal to instruct the jury on strict liability, which refusal was based upon Health and Safety Code section 1606 as interpreted in *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132]. In that case a patient sought to recover damages on a strict liability theory for hepatitis contracted from a blood transfusion administered by the defendant hospital. The court held that Health and Safety Code section 1606[2] precluded the imposition of strict

---

[2]Health and Safety Code section 1606 reads: "The procurement, processing, distribution, or use of whole blood, plasma, blood products, and blood derivatives for the purpose of injecting or transfusing the same, or any of them, into the human body shall

liability. This section was adopted by the Legislature in 1963, having previously been Health and Safety Code section 1623, adopted in the year 1955. It now appears in article 2 of chapter 4 of the Health and Safety Code, under the title "Human Whole Blood and Human Whole Blood Derivatives." Several of the sections within article 2 specifically refer to blood banks, while others, such as section 1606, use broader terms.

In *Shepard* the court noted that California has two tests for strict liability, the test from the Restatement Second of Torts, and the test stated in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]. The Restatement imposes strict liability for physical harm resulting when one "sells any product in a defective condition unreasonably dangerous to the user or consumer. . . ." (Rest. 2d Torts, § 402 A.) *Greenman* states that "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (59 Cal.2d at p. 62.) The *Shepard* court noted further that there was a common denominator, "the requirement of a *defective product* which, when placed in the stream of commerce, causes injury." (33 Cal.App.3d at p. 609.) Accordingly, "the question to be decided here is not simply whether human blood is or can be designated as a product . . . . Rather, . . . the precise issue is whether or not the *blood transfusion,* the alleged cause of appellant's injury, constitutes a cause of action under the doctrine of strict liability, either because it qualifies as a product and/or a sale." (33 Cal.App.3d at p. 609.) In answering this question, the court stated, "The California Legislature, by statutory enactment, has expressed its intent and declared a clear legal policy that the transfusion of blood and blood product into the human body shall be construed for *all purposes* to be the rendition of a service and not a sale." (33 Cal.App.3d at p. 609.) In summarizing the rationale behind section 1606, the *Shepard* court noted (at p. 610) that *Perlmutter* v. *Beth David Hospital* (1954) 308 N.Y. 100 [123 N.E.2d 792], was the inspiration for enacting the predecessor of section 1606, and used the following language (at p. 611) to explain the rationale behind it: "[P]rofound justification exists for the Legislature to determine that a blood transfusion, provided in the course of treatment, should be considered a service rather than a product or sale. It needs no extended

---

be construed to be, and is declared to be, for *all purposes whatsoever*, the rendition of a service by each and every person, firm, or corporation participating therein, and shall not be construed to be, and is declared not to be, a sale of such whole blood, plasma, blood products, or blood derivatives, for any purpose or purposes whatsoever." (Italics added.)

discussion to perceive that a hospital is primarily devoted to the care and healing of the sick. The supplying of blood by the hospital is entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore the patient's health. Providing medicine or supplying blood is simply a chemical aid or instrument utilized to accomplish the objective of cure or treatment. The patient who enters a hospital goes there not to buy medicines or pills, not to purchase bandages, iodine, serum or blood, but to obtain a course of treatment (*Perlmutter* v. *Beth David Hospital, supra,* at pp. 795-796; *Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027 [98 Cal.Rptr. 187]). It is also obvious that in the normal commercial transaction contemplated in the strict liability cases the essence of the transaction relates *solely* to the article sold, the seller is in the business of supplying the product to the consumer and it is that, and that alone for which he is paid (*Magrine* v. *Spector* (1968) 100 N.J.Super. 223 [241 A.2d 637]). The foregoing marked distinctions compel the conclusion that *a hospital* is not engaged in the business of distributing blood to the public and *does not put the blood as a product on the market in order to profit therefrom.*"

It is quite apparent that in the instant case we are not dealing with a hospital or a blood bank, but with a private manufacturer of pharmaceuticals that is engaged in the business of distributing Konyne, a blood product, and puts that "product on the market in order to profit therefrom." Health and Safety Code section 1606 to date has been held applicable to hospitals and blood banks, but the question of its applicability to commercial vendors of blood products has not been answered. We are persuaded that the clear language of section 1606 requires us to construe the respondent's distribution of Konyne as the rendition of a service and not to be "a sale of such whole blood, plasma, blood products, or blood derivatives, for any purpose or purposes whatsoever."

However, quite apart from Health and Safety Code section 1606, *Shepard* supplies a rationale for excluding the manufacturer and distributor of Konyne from strict liability in tort, as follows: "Additional policy considerations also militate against the imposition of strict liability in the situation here presented. Thus, it is widely recognized that despite every effort to screen donors, the possibility that hepatitis virus may be present in the dried plasma cannot be completely obviated. Moreover, if the virus is present, it cannot be discovered by microscopic examination or by any other test known to medical science. (*McDaniel* v. *Baptist*

·*Memorial Hospital* (6th Cir. 1972) 469 F.2d 230, 234; *Merck & Co.* v. *Kidd* (6th Cir. 1957) 242 F.2d 592; see also: *A New Principle of Products Liability in Service Transactions* (1969) 30 U.Pitt.L.Rev. 508, 515)." (*Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at p. 611.)

The same rationale is stated by Prosser, Law of·Torts (4th ed. 1971) Unsafe Products, section 19 at pages 661-662, as follows: "There are a number of cases involving hepatitis resulting from blood transfusions. So far as the transfusion itself is concerned, it has been regarded by most courts as a service, and not a sale, so that in the absence of negligence there is no liability of the hospital which gives it. But a blood bank which supplies the blood is certainly to be regarded as a seller; and *the general refusal to hold it strictly liable has gone on the basis of the unavoidability of the danger.* When any evidence can be produced that it might have been avoided, it becomes a question for the jury, and may lead to liability." (Italics added.) Prosser further notes at page 661: "Where only negligence liability is in question, the answer as to such products is usually a simple one. The utility and social value of the thing sold normally outweighs the known, and all the more so the unknown risk, and there is no negligence in selling it, provided always that proper warning and directions are given. But strict liability, whether on warranty or in tort, does not require negligence; and the question becomes one of whether the defendant is to be held liable for marketing the thing at all. The argument that industries producing potentially dangerous products should make good the harm, distribute it by liability insurance, and add the cost to the price of the product, encounters reason for pause, when we consider that two of the greatest medical boons to the human race, penicillin and cortisone, both have their dangerous side effects, and that drug companies might well have been deterred from producing and selling them."

The contention was made in *Shepard,* as it is in the instant case, that even if Health and Safety Code section 1606 requires a holding that what is in fact a sale must be construed to be the rendition of a service, strict liability may still attach. The court in *Shepard* answered this contention by stating that "we are constrained to adhere to the time-honored, well-established law which states that those who sell their services for the guidance of others in their economic, financial and personal affairs are burdened only with a duty of reasonable performance under the circumstances and cannot be made liable in the absence of negligence or intentional misconduct (*Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15]; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 978 [95 Cal.Rptr.

381]). Accordingly, we hold that the doctrine of strict liability in tort does not extend to the service of blood transfusions." (*Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at pp. 613-614; to the same effect see, *McDonald* v. *Sacramento Medical Foundation Blood Bank* (1976) 62 Cal.App.3d 866, 870-871 [133 Cal.Rptr. 444].)

There is nothing in the instant record to suggest that Konyne is not an effective coagulant. On the contrary, the record discloses that in the case at bench bleeding stopped within two hours after the extraction of Mr. Fogo's tooth on September 8, 1971. In contrast with this there had been much longer bleeding episodes experienced in previous extractions in which Konyne was not administered. The record indicates that Konyne was the first Factor IX concentrate developed and, following its introduction, the Cutter Laboratories received the 1969 Research and Achievement Award from the National Hemophilia Foundation. Competent medical testimony established that Konyne, despite its hepatitis risk, has been instrumental in helping many hemophiliacs with Factor IX deficiencies attain normal and productive lives.

■ It is the manufacturer's duty, if he is to be exempt from liability, to give adequate warnings of the possible risks involved in the use of the product he markets. (*Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 710-711 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) As was said in *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958, 989 [95 Cal.Rptr. 381]: ■ "It is the general rule that the duty of adequate warning by the manufacturer of an ethical drug is discharged by its warning of hazards to doctors who may in the exercise of their medical judgments decide to use the drug as a part of their chemotherapy. (*Love* v. *Wolf* (1964) *supra,* 226 Cal.App. 2d 378, 394-395 [38 Cal.Rptr. 183]; *Magee* v. *Wyeth Laboratories, Inc.* (1963) *supra,* 214 Cal.App.2d 340, 350, 352 [29 Cal.Rptr. 322]; accord: *Davis* v. *Wyeth Laboratories, Inc.* (9th Cir. 1968) *supra,* 399 F.2d 121, 130; *Basko* v. *Sterling Drug, Inc.* (2d Cir. 1969) 416 F.2d 417, 426.) Absent special circumstances, known or foreseeable in the exercise of due care by the manufacturer, there is no duty to warn the patient. (*Love* v. *Wolf, supra*; *Magee* v. *Wyeth Laboratories, Inc., supra.*) [¶] The rationale of the foregoing rule is: '(1) The doctor is intended to be an intervening party in the full sense of the word. Medical ethics as well as medical practice dictate independent judgment, unaffected by the manufacturer's control, on the part of the doctor. (2) Were the patient to be given the complete and highly technical information on the adverse possibility associated with the use of the drug, he would have no way to evaluate it, and in his limited understanding he might actually object to the use of the drug,

thereby jeopardizing his life. (3) It would be virtually impossible for a manufacturer to comply with the duty of direct warning, as there is no sure way to reach the patient.' (Rheingold, *Products Liability—The Ethical Drug Manufacturer's Liability* (1964) . . . 18 Rutgers L.Rev. 947, 987.)"

We now consider whether the warnings in the instant case were adequate. The evidence established without contradiction that although the hepatitis virus, if present, may be removed from some of the fractions recovered during the fractionating process, it cannot be removed from Konyne without destroying the activity of the Factor IX plasma itself. Accordingly, there is prominently displayed in bold print on the box, and in the package insert in a linear box under the heading "WARNINGS," also in bold print, the following: "Since the presence or absence of hepatitis virus in Konyne cannot be proven, *the presence of such virus should be assumed* and the hazard of administering Konyne should be weighed against the medical consequences of withholding the use of Konyne." (Italics added.) The label on the product also contained the warning "HEPATITIS DANGER."

On the assumption that the adequacy of a warning in this case required expert testimony the appellants' expert was permitted to testify that the warning was inadequate and respondent's experts maintained that it was adequate. The matter was argued extensively by counsel for both sides and went to the jury under appropriate instructions. By its verdict the jury impliedly found in respondent's favor on this issue, and appellants make no contention that there is not substantial evidence to support such finding.

■ However, appellants argue that comments by the court about an answer given by appellants' expert on the subject of the adequacy of the warning requires reversal. The witness stated that the word "pooling" added to the warning would have given treating physicians a better appreciation of the danger of hepatitis associated with the use of Konyne. Allegedly the court said: "I just can't believe that," a remark which was not contained in the reporter's transcript. From reading the record it is not possible to discover the exact place where such remark might have been made, and counsel makes no claim that he objected at that time. On the following day at an *in camera* conference appellants' counsel expressed concern about the incident and the judge tacitly acknowledged that some such remark had possibly been made and agreed to instruct the jury, at the appropriate time, to disregard it.

Counsel voiced no objection to that procedure and the court at the conclusion of the case instructed the jury in the language of BAJI No. 15.20.[3]

Appellants cite *Iloff* v. *Purity Stores, Ltd.* (1960) 178 Cal.App.2d 1 [2 Cal.Rptr. 735], *Etzel* v. *Rosenbloom* (1948) 83 Cal.App.2d 758 [189 P.2d 848], and *Steele* v. *Wardwell* (1943) 57 Cal.App.2d 642 [135 P.2d 628], in support of their contention that the court's comments constituted reversible error. The respondent refers to California Constitution, article VI, section 10 (formerly § 19) which permits the court to comment on the evidence.

In *Schnear* v. *Boldrey* (1971) 22 Cal.App.3d 478, 483 [99 Cal.Rptr. 404], it is stated: "The only limitations upon the judge's power to comment on the evidence are that he may not withdraw evidence from the jury's consideration or distort the testimony; and he must inform the jurors that they are the exclusive judges of all questions of fact and of the credibility of the witnesses (*People* v. *Friend* (1958) 50 Cal.2d 570, 577-578 [327 P.2d 97])."

Respondent argues that appellants waived their right to complain about the judge's comment by failing immediately to request the instruction that the jury disregard it or to declare a mistrial. While no formal request was made at the time of the occurrence appellants' counsel's discussion with the court the following day negates any suggestion that there was a waiver. It was at that time that the court agreed to give BAJI No. 15.20. In *Gist* v. *French* (1955) 136 Cal.App.2d 247, 257-259 [288 P.2d 1003] (disapproved on other grounds in *Deshotel* v. *Atchison, T. & S. F. Ry. Co.* (1958) 50 Cal.2d 664, 667 [328 P.2d 449], and *West* v. *City of San Diego* (1960) 54 Cal.2d 469, 478 [6 Cal.Rptr. 289, 353 P.2d 929]), a similar instruction was held to have cured any error in the judge's comments.

 The appellants complain that "[t]he Court displayed, even before a jury was picked, a prejudice against plaintiffs' case, and, during the course of the trial, acted in such a way toward plaintiffs' counsel as to convey to the jury the impression that plaintiffs' counsel was acting in an improper and unethical manner." Thereafter a sampling of incidents is

---

[3]The instruction given was as follows: "I have not intended by anything that I have said or done or by any question that I may have asked to intimate or suggest how you should decide any question of fact submitted to you or that I believe or disbelieve any witness. If anything I have done or said has seemed to so indicate you will disregard it and form your own opinion with respect to facts in this case."

presented, including the one just discussed. Similar claims were made in *Miller* v. *Western Pac. R. R. Co.* (1962) 207 Cal.App.2d 581, 606 [24 Cal.Rptr. 785], where the court stated: "They point to 11 separate instances in the record, each of which we have considered and do not find to be prejudicial. The record indicates that the appellants were accorded a fair and impartial trial and that the trial judge presided with courtesy and patience. The record is devoid of any indication that the appellants were not given a full opportunity to present their case. Each of the claimed instances of prejudicial error, when read in their proper context, disclose that they arose in conjunction with the court's discussion of the propriety of the admissibility of certain evidence, the validity of objections thereto, the reasons for its rulings, or the clarity of the language in which a question was framed."

The record in the instant case leads us to the same conclusion reached in *Miller*, and for the same reasons. (See also *Chadwick* v. *Condit* (1962) 205 Cal.App.2d 313, 320 [23 Cal.Rptr. 245].)

With regard to the claim that the court displayed prejudice against appellants' case before the jury was empaneled counsel refers to a pretrial discussion in chambers at which court and counsel expressed their views as to whether California or Kansas law applied with respect to damages. Kansas law limits wrongful death damages to $50,000 whereas such damages are unlimited under California law. The prayer in the instant complaint was for $2.5 million general damages and $10 million punitive damages. The court asked counsel what amount he would ask the jury to assess for pecuniary loss suffered by the heirs of a 57-year-old man whose earnings at the time of death were in the neighborhood of $10,000 per year. When counsel told the court he would ask for $500,000 the judge stated that he thought counsel may be overreaching and that he was personally thinking of a lower amount.

The court then advised appellants' counsel that he was concerned about the forum shopping argument made by respondent's counsel. Respondent earlier in the proceedings in an effort to have the case dismissed under Code of Civil Procedure section 410.30, had claimed that since the plaintiffs resided in Kansas, decedent died there, the Konyne was sold there, the doctors who treated decedent lived in Kansas and all the doctors' and hospital records were in that state, the case should be tried there. A similar claim was made before the trial judge as the reason why Kansas law on damages should apply. A discussion then followed concerning which law would apply if the treating physician had

been made a party. During the course of these discussions appellants' Kansas counsel stated that the decedent's widow was not merely interested in the increased damages she might obtain in California but also "in getting to the truth with regard to the way this company [Cutter Laboratories, a Delaware corporation] draws blood." The court then replied, "Come on, don't try to tell [*sic*] me that kind of an argument." When read in their proper context, each of the claimed instances of error fall within the heretofore quoted language of Justice Molinari in *Miller v. Western Pac. R. R. Co., supra,* 207 Cal.App.2d 581, 606.

█ Appellants next contend that the trial court's refusal to give proffered instructions on the theory of express warranty constitutes reversible error. Appellants' second cause of action was for breach of an express warranty "that said product [Konyne] was effective, proper, and safe for its intended use." While the express warranty is pleaded in terms similar to an implied warranty of merchantability and fitness for intended use the appellants at trial relied on the first paragraph of the following warranty contained in the package insert: "We warrant that at the time of manufacture this product was prepared and tested according to the applicable standards of the United States Public Health Service Regulations and was true to label. [¶] Because of biological differences in individuals, no product is 100% effective under all circumstances. Because of this fact and since we have no control over the conditions under which the product is used; diagnosis of the patient, dosage, methods of administration, or its handling after it leaves our possession, *we do not warrant either a good effect or against an ill effect following its use.* [¶] *The foregoing warranty is exclusive and in lieu of all other warranties either written, oral or implied (including any warranty of merchantability or fitness for purpose).* No representative of the company may change any of the foregoing and the buyer hereby accepts the product subject to all the terms hereof." (Italics added.)

Clearly the underscored words constitute a disclaimer of the express warranty alleged in the second cause of action, and the implied warranty claimed to have been breached in the third cause of action. However the appellants' opposition to the respondent's motion for a nonsuit on the second cause of action, as heretofore noted, was based entirely on the language in the first paragraph of the above warranty that the "product was prepared and tested according to the applicable standards of the United States Public Health Service Regulations." Respondent argued that section 1606 of the Health and Safety Code bars the breach of warranty action; that appellants had failed to present in evidence any

public health regulations which they claim were violated; and, that the appellants failed to present any evidence that the treating physician relied on the warranty. The appellants attempted to remedy the second objection by offering the then pertinent Public Health Regulations (42 C.F.R.) subsequent to the granting of the motion for nonsuit.

Appellants assert that Health and Safety Code section 1606 does not bar the requested instructions since a service may be the subject of an express warranty citing *Shepard,* and *Aced* v. *Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 582 [12 Cal.Rptr. 257, 360 P.2d 897]. In *Shepard,* the court pointed out that *Aced* merely stands for the proposition that implied warranties may be applicable to contracts not governed by the Commercial Code " 'when the contracts are of such a nature that the implication is justified.' " (*Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at p. 614.) It then concluded that such an implication was not justified when applied to contracts involving blood transfusions in view of the policy consideration which prohibited the application of the doctrine of strict liability. "Since, under the foregoing authorities, the liability imposed by strict liability in tort and breach of express and implied warranties is virtually the same, i.e., a form of liability without fault, the conclusion reached in the earlier discussion is applicable here." (*Shepard, supra,* at p. 615.)

The instructions which the court refused to give were based upon BAJI Nos. 9.41 through 9.44, 9.50 and 9.63, to the effect that the transaction involving the use of Konyne, despite the broad language of Health and Safety Code section 1606, was a *sale* of the product by the blood processor to the decedent. If appellants intended that the trial court instruct the jury that the transaction was a *service* rather than a sale, proper instructions to that effect should have been submitted. (*Faulk* v. *Soberanes* (1961) 56 Cal.2d 466, 470-471 [14 Cal.Rptr. 545, 363 P.2d 593]; *Shaw* v. *Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158 [323 P.2d 391].) "A trial judge is not required to correct requested instructions which are incomplete or erroneous . . . ." (*Faulk* v. *Soberanes, supra,* at pp. 470-471.) Furthermore, since a sale is ordinarily an essential element of any warranty, express or implied (Cal. U. Com. Code, §§ 2313-2316; *Shepard* v. *Alexian Brothers Hosp., supra,* 33 Cal.App.3d at pp. 614-615; *Grinnell* v. *Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 440 [79 Cal.Rptr. 369]; *Gottsdanker* v. *Cutter Laboratories* (1960) 182 Cal.App.2d 602, 609 [6 Cal.Rptr. 320, 79 A.L.R.2d 290]), appellants' contention is of doubtful validity.

Appellants have not pointed to a specific United States Public Health Service Regulation which the respondent is claimed to have breached. Instead they assert that the "Cutter Standard Operating Procedures Plasmapheresis Manual" had the force of "federal regulations" by reason of former section 73.240, 42 Code of Federal Regulations, Public Health Regulations (presently found in 21 C.F.R. pt. 640), which required that the Director of the National Institute of Health make a finding that the applicant has established procedures to insure compliance with the applicable regulations. It did not bestow upon any materials which may have been submitted with the application the status of a federal regulation.

The appellants introduced evidence that two of the plasmapheresis centers from which plasma was obtained were located in slum areas, and that many persons seen entering and leaving the centers appeared to be unclean, elderly, transients, alcoholics and otherwise debilitated. From this evidence appellants asked the jury to conclude that respondent was negligent in accepting and using plasma from blood taken from unhealthy donors. The jury found against appellants and in favor of respondent on the negligence count.

Respondent argues that if, despite Health and Safety Code section 1606, the processor of blood product in the instant case were held to be liable, under the Uniform Commercial Code, for breach of an express warranty, one of the essential elements of such cause of action—reliance on such warranty by the treating physician—is absent. There is no testimony in the record that Dr. Schlotterback, the physician who elected to use Konyne rather than frozen plasma, ever saw the warranty or relied upon it.

Official comment 3 to section 2313 of the Uniform Commercial Code has raised an issue as to whether or not reliance is a necessary element in a contract subject to the Commercial Code. *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 114-117 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282], points out that there is general disagreement as to the effect of this comment, but that most states which have considered the issue have held it is still "a vital ingredient for recovery." (14 Cal.3d at p. 116, fn. 13.) The Commercial Code is not applicable to the case at bench but if breach of warranty may properly be charged in transactions involving services as well as sales there appears to be no reason to hold that reliance upon the warranty is not still a vital ingredient for recovery. As was held in *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15],

"those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct." Accordingly, the trial court did not err in refusing the proffered instructions on breach of express or implied warranty.

■ Appellants' final assignment of error is the trial court's refusal to give the following instruction based on *Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 69 [107 Cal.Rptr. 45, 507 P.2d 653]: "Where a manufacturer of a drug gives a warning of a danger associated with that drug, the manufacturer is not relieved of liability where it was reasonably foreseeable that physicians, despite awareness of the dangers of the drug, would be consciously or subconsciously induced to prescribe a drug when it was not warranted due to the inadequacy of the warning or misleading advertisements and instructions by the manufacturer."

In *Stevens* the jury impliedly found that the defendant drug firm was negligent in that it failed to provide an adequate warning to the medical profession as to the dangers of Chloromycetin and it so overpromoted the product as to cause the treating doctor to prescribe the drug. One crucial distinction in *Stevens* is the charge of *overpromotion* of the drug which is not made nor established by the evidence in the instant case.

A further distinction in *Stevens* is that the treating physician was one of the defendants at the trial level; had been held liable for his negligence; and did not appeal. In the present case, the treating physician was not named, and respondent attempted to establish that the negligence of the physician might have been the sole proximate cause of the decedent's demise. The proposed instruction goes too far in understating the possible negligence of the treating physician as the cause of death. Further it is confusing in implying that *any* warning will not relieve a manufacturer of liability if it is reasonably foreseeable that a physician might prescribe a drug due to *inadequacy* of the warning.

The instructions given by the trial court adequately set out the standard of negligence for Cutter Laboratories, including the duty to warn. They mention the possibility of concurrent negligence contributing as the proximate cause of the injury, and end by stating, "It is no defense that the negligent conduct of a person not joined as a party was also a proximate cause of the injury." ■ As was stated in *Carmichael* v. *Reitz, supra,* 17 Cal.App.3d at page 986: "It is, of course, hornbook law that in civil cases, the trial court is under no obligation to modify or

recast proffered instructions to make them applicable and it may reject them if the portions thereof which correctly state the applicable law are covered by other instructions given." There was no error in refusing the proffered instruction.

It is concluded that appellants' strategy in filing this action in California rather than in Kansas where the treating physician could have been joined as a defendant was unfortunate. Arguably the sole proximate cause of the decedent's death was the decision to administer any coagulant, particularly one in which "the presence of [hepatitis] virus should be assumed," to a patient with mild hemophelia whose only exposure to bleeding was to be the extraction of a tooth.

The judgment appealed from is affirmed. The purported appeal from the order denying the motion for a new trial is dismissed.

Sims, Acting P. J., and Elkington, J., concurred.