[No. B193915. Second Dist., Div. Three. Jan. 10, 2008.]

TASHA SUMPTER et al., Plaintiffs and Appellants, v.
RICHARD ARDEN MATTESON et al., Defendants and Respondents.

**COUNSEL**

Donahoo & Associates and Richard E. Donahoo for Plaintiffs and Appellants.

Kinkle, Rodiger & Spriggs, Guillermo W. Schnaider and R. Denyse Greer for Defendants and Respondents.

## OPINION

KLEIN, P. J.—Plaintiffs and appellants Tasha Sumpter (Sumpter) and Mykayle Booker (Mykayle), by and through his guardian ad litem, Sumpter (collectively, Sumpter), appeal a judgment following a jury verdict in their favor and against defendants and respondents Richard Arden Matteson (Matteson) and Dorman DeHaas (DeHaas). Sumpter contends the jury's award of $13,317.91 in economic damages was insufficient as a matter of law and that punitive damages must be assessed against Matteson as a matter of law.[1]

Substantial evidence supports the jury's determination to award Sumpter $13,317 in economic damages, rather than her claimed medical bills of $131,282; the jury properly concluded only a small portion of Sumpter's medical bills were causally related to the instant accident.

Further, even though there was abundant evidence that Matteson acted with a conscious disregard for the safety of others, it was the jury's prerogative, after being duly instructed, to find that Matteson acted without malice and thereby decline to award punitive damages. We reiterate the principle that a plaintiff is never entitled to punitive damages as a matter of right, not even " '[u]pon the clearest proof of malice in fact.' " (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713].)

Therefore, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Facts.*

On February 25, 2002, the day of the accident, Matteson spent the afternoon at home, where he was using methamphetamines.[2] Matteson ingested drugs "right before" he left his house. *By his own admission, Matteson knew he was under the influence when he got into his car.* He was planning on taking a minivacation and packed a suitcase of drugs, including marijuana, a vial of ketamine, eight bottles of GHB (gamma hydroxybutyric acid) as well as cocaine.

---

[1] Sumpter and Mykayle also purport to appeal the trial court's order denying their motion for new trial. However, no appeal lies from an order *denying* a motion for new trial. Such proceedings are reviewable on the appeal from the judgment. (*Fogo v. Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 748–749 [137 Cal.Rptr. 417]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 123, p. 188.)

[2] No evidence was presented as to the quantity of methamphetamines Matteson ingested, nor was there any expert testimony as to the impact of the drug on Matteson's driving ability.

About 3:30 p.m., Matteson met with DeHaas to exchange cars, because DeHaas was going to have the brakes on Matteson's vehicle repaired. The accident occurred less than an hour later.

Matteson drove the borrowed vehicle, a red sports car, eastbound on the Santa Monica Freeway, exiting at La Brea. He was driving in excess of the speed limit. As he approached the intersection of Fairview and La Brea, he saw the light was red. He could see the light was red more than a quarter-mile before he reached the intersection. Matteson never braked, explaining he "thought the light was going to change" to green. Matteson admitted the reason he thought the light would change and the reason he took that risk was because he was on methamphetamine and he would not have driven in that manner if he were sober.

Matteson ran the red light. He hit a vehicle in the intersection, sideswiped Sumpter's vehicle and then struck a third vehicle.[3]

At the time of impact, Sumpter was stopped in the left-hand turn lane of eastbound Fairview, waiting to turn north onto La Brea. With her in the vehicle were three of her children, including her infant son Mykayle, who was secured in an infant seat in the rear.

Sumpter advised a police officer at the scene she did not realize her vehicle had been hit until she exited her vehicle and saw the damage. Sumpter informed the investigating officer she was not injured and she declined to be transported from the accident scene.

Sumpter first sought treatment on March 8, 2002, 11 days after the accident, with Dr. Korthuis, a chiropractor. Sumpter complained of headache, shoulder and lower back pain, as well as pain in the left leg. Dr. Korthuis only recommended X-rays. Sumpter decided to go to a different doctor. A week later, she started a course of chiropractic treatment with Dr. Cohen. Sumpter's treatment with Dr. Cohen concluded on August 8, 2002, after about five months.

### 2. *Proceedings.*

On February 14, 2003, Sumpter filed a personal injury complaint against Matteson as well as DeHaas, contending DeHaas negligently permitted Matteson to use his vehicle. Sumpter subsequently filed a first amended

---

[3] Matteson was charged with seven counts in connection with this accident. He pled guilty to two counts, felony driving under the influence while causing bodily injury and possession of a controlled substance. As part of the plea agreement, he served 33 days of a 90-day sentence in county jail before being released due to jail overcrowding. He also paid a $3,300 fine.

complaint, seeking punitive damages against Matteson on the ground he engaged in despicable conduct with a willful and conscious disregard to the rights or safety of others, in that he knew he was under the influence while driving the vehicle.

On May 8, 2006, the matter came on for a jury trial. On May 18, 2006, the jury returned a special verdict, awarding Sumpter $13,317.91 for past economic loss, including lost earnings and past medical expenses, zero for future economic loss, $20,000 for past noneconomic loss and zero for future noneconomic loss. As for Mykayle, the jury awarded him $250 for past economic loss only. The jury also determined that Matteson did not "engage in the conduct with malice or oppression."[4]

Judgment on the special verdict was entered on July 3, 2006, and notice of entry of judgment was served on July 10, 2006.

On July 25, 2006, Sumpter filed a motion for new trial or in the alternative, for additur.

In the motion for new trial, Sumpter contended the economic damage award of $13,317.91 was inadequate as a matter of law in light of her medical bills of $131,282.42.

Sumpter also contended that in finding Matteson acted without malice, the jury returned a verdict which was contrary to the evidence. Sumpter argued, "[b]y Matteson's own admission, he was aware of the probable dangerous consequences of his conduct, and he willfully and deliberately failed to avoid those consequences. He knew he was under the influence when he drove the car and *he knew the light was red for over a quarter mile* before he entered the intersection. Nonetheless, he decided to 'take the risk' and run the red light. Such conduct is nothing other than despicable, evidencing a willful and knowing disregard for others."

By way of opposition, Matteson and DeHaas contended the amount of economic damages was supported by the evidence, the jury reasonably

---

[4] With respect to punitive damages, the jury was instructed in pertinent part: "If you decide that Richard Matteson's conduct caused plaintiffs harm, you must decide whether that conduct justifies an award of punitive damages. At this time, you must decide whether plaintiffs have proved by clear and convincing evidence that Richard Matteson engaged in that conduct with malice or oppression. The amount of punitive damages, if any, will be decided later. [¶] Malice means that Richard Matteson acted with intent to cause injury or that his conduct was despicable and was done with a willful and knowing disregard of the rights or safety of others. A person acts with knowing disregard when he or she is aware of the probable dangerous consequences of his or her conduct and deliberately fails to avoid those consequences. [¶] . . . [¶] Despicable conduct is conduct that is so vile, base, or contemptible that it would be looked upon . . . and despised by reasonable people."

concluded Sumpter's injuries from the instant accident were mild and were fully resolved by August 8, 2002, and that medical expenses for subsequent lumbar surgery and knee surgery were not causally related to the accident.[5] As for the finding of no malice, the opposition papers argued the jury reasonably concluded that Matteson, being profoundly addicted to drugs, did not act with an injurious intent, and that finding was entitled to deference by the trial court.

On August 18, 2006, the trial court heard and denied the motion for new trial, stating: "Plaintiffs fail to establish that the evidence did not justify the verdict, that the verdict was contrary to law, or that the damages were inadequate. The evidence presented as to Tasha Sumpter's alleged pre-existing injury was sufficient for the jury to determine that perhaps not all of plaintiff's alleged injuries and damages were causally connected to this incident. [¶] Additionally, the evidence was sufficient for the jury to determine whether [Matteson] acted with or without malice or oppression."

On September 14, 2006, Sumpter filed a timely notice of appeal from the judgment. (Cal. Rules of Court, rule 8.108(a).)

## CONTENTIONS

Plaintiffs contend: The jury's award of economic damages was inadequate as a matter of law; the jury's finding of no malice was not supported by substantial evidence, so as to entitle plaintiffs to punitive damages as a matter of law; and the trial court abused its discretion by failing to weigh the evidence on plaintiffs' motion for new trial or, in the alternative, for an additur.

## DISCUSSION

1. *Substantial evidence supports the jury's determination to award Sumpter $13,317 in economic damages, rather than her claimed medical bills of $131,282; the jury properly concluded only a small portion of Sumpter's medical bills were causally related to the instant accident.*

   a. *Sumpter's prior injuries.*

On April 19, 2001, 10 months before the instant accident, Sumpter fell at a Taco Bell restaurant. She visited the Centinela Hospital emergency room the same day, complaining of low back pain. The next day, she began treatment with Dr. Revere.

---

[5] Sumpter's medical history will be discussed in greater detail in the Discussion portion of this opinion.

A month later, she returned to Centinela Hospital with continuing complaints of low back pain from the fall. She treated with Dr. Tayebaty, another chiropractor, for symptoms that included severe lower back pain radiating into her left leg. Treatment continued until January 2002, one month before the instant accident. At the time Sumpter was discharged by Dr. Tayebaty, she still had complaints involving her lower back.

### b. *Subsequent injuries and treatment, including back and knee surgery.*

In November 2002 (three months after Sumpter was discharged from her treatment by Dr. Cohen relating to the instant accident), Sumpter fell in her backyard when her left knee locked. The following day, X-rays were taken of the left knee. This was the first occasion that X-rays were taken of the left knee since the subject accident of February 25, 2002. Sumpter did not previously contend she had struck her knee in that accident.

In April 2003, due to continuing knee complaints, Sumpter was examined by Dr. Cohen, who recommended an MRI (magnetic resonance imaging) and referred her to an orthopedic surgeon. She was prescribed a leg brace and physical therapy.

In January 2004, Sumpter, who is a nurse, injured her neck and right shoulder at work while helping a patient to the commode. Three months later she was placed on disability because of an industrial injury. At the time of trial in May 2006, she had not returned to work.

In 2005, Sumpter was seen by Dr. Rezaian, an orthopedic surgeon. He ordered MRI's of her back and knee and diagnosed a herniated disc and a torn meniscus in the knee. He recommended and performed back surgery in April 2005 and knee surgery in March 2006.

### c. *Medical testimony pertaining to causation.*

Dr. Cohen, the chiropractor who treated Sumpter after the instant accident, testified that when she was discharged on August 8, 2002, her injury was resolved and her only complaint was of occasional slight upper back soreness primarily on the left side. Dr. Cohen further testified Sumpter resumed her treatment with him in April 2003. This second round of treatment was in response to a flareup of the lower back symptoms caused by the demands of her employment.

Dr. Chafetz, a board certified diagnostic radiologist, testified as a defense expert. He reviewed X-rays of Sumpter's lumbar spine taken 11 days after the

subject accident and concluded there was evidence of moderate degenerative disc disease. Dr. Chafetz testified the disc degeneration shown on the X-ray took years to develop and clearly was present before the accident. He testified there was no abnormality related to a single traumatic event.

Dr. Smith, a board certified orthopedic surgeon, examined Sumpter on May 24, 2004. Dr. Smith testified the left knee injury was not caused by the subject accident because there was no report of knee complaints until the November 6, 2002 incident in which Sumpter fell in her backyard. He opined the knee injury was more consistent with stepping on and twisting the knee as opposed to trauma from hitting the knee on a steering column or dashboard. He testified any injury sustained in the subject accident was at most a minor soft tissue injury that permitted her to wait 11 days before seeing a health care provider, and that the injury did not cause persistent symptoms beyond August 8, 2002, when Sumpter was released by Dr. Cohen and returned to her preinjury status. According to Dr. Smith, treatment should have consisted of physical therapy for six to eight weeks.

> d. *Substantial evidence supports jury's determination as to damages.*

Based on the testimony set forth above, substantial evidence supports the jury's determination that only a small portion of Sumpter's claimed damages was attributable to the subject accident. To reiterate the trial court's ruling at the time it denied Sumpter's motion for new trial, "[t]he evidence presented as to [Sumpter's] alleged pre-existing injury was sufficient for the jury to determine that perhaps not all of plaintiff's alleged injuries and damages were causally connected to this incident."

> 2. *Even though there was abundant evidence Matteson acted with a conscious disregard for the safety of others, a plaintiff is never entitled to punitive damages as a matter of right; it was the jury's prerogative to find Matteson acted without malice.*

Sumpter's remaining contention is that she is entitled to a new trial on the *amount* of punitive damages because the undisputed evidence gives rise to only one inference: Matteson's conduct was malicious so as to entitle Sumpter to punitive damages as a matter of law. Sumpter contends "[t]he judgment should be reversed *with directions* that Appellants are entitled to punitive damages as a matter of law, and remanded for a new trial on the *amount* of those damages." (Italics added.) In effect, Sumpter contends she is

entitled to a directed verdict on her entitlement to punitive damages. (See generally *Walters v. Bank of America etc. Assn.* (1937) 9 Cal.2d 46, 49 [69 P.2d 839] [either a plaintiff or a defendant may obtain a directed verdict in a proper case].) Sumpter's contention that punitive damages must be assessed as a matter of law is without merit.

We are mindful that Matteson ingested drugs "right before" he left his house, that by his own admission, Matteson knew he was under the influence when he got into his car, and that Matteson knew the light was red for over a quarter-mile before he entered the intersection, yet he never braked, choosing instead to take the risk and run the red light. Such conduct reflects a conscious disregard for the rights and safety of others and would have supported the imposition of punitive damages in this case. (Civ. Code, § 3294, subd. (c)(1).) However, the issue before us is not whether the evidence would have supported an award of punitive damages by the jury, but rather, whether the jury's finding that Matteson acted without malice requires reversal and a new trial on the amount of punitive damages.

■ Sumpter's contention the undisputed evidence Matteson acted with conscious disregard entitles her to punitive damages as a matter of right has no support in the law. As Justice Traynor explained in *Brewer v. Second Baptist Church, supra,* 32 Cal.2d at pages 800–801: "[A] plaintiff is never entitled as a matter of right to exemplary damages. [Citations.] . . . '. . . A plaintiff, upon establishing his case, is always entitled of right to compensatory damages. *But even after establishing a case where punitive damages are permissible, he is never entitled to them. The granting or withholding of the award of punitive damages is wholly within the control of the jury,* and may not legally be influenced by any direction of the court that in any case a plaintiff is entitled to them. *Upon the clearest proof of malice in fact, it is still the exclusive province of the jury to say whether or not punitive damages shall be awarded.* A plaintiff is entitled to such damages only after the jury, in the exercise of its untrammeled discretion, has made the award.' " (Italics added.) Further, because a plaintiff is never entitled as a matter of right to an award of punitive damages, it would be error to instruct the jury that a plaintiff is entitled to recover such damages upon a finding of specified facts by the jury. (*Ibid.*)

■ Therefore, although on this record the imposition of punitive damages would have been permissible, it was the jury's exclusive prerogative, after being duly instructed, to find Matteson acted without malice and thereby decline to award punitive damages.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Kitching, J., and Aldrich, J., concurred.